Filed 5/15/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of AMINE BRITEL, Deceased. | |
| JACKIE S. et al., | |
| Petitioners and Appellants, | G049161 |
| v. | (Super. Ct. No. 30-2011-00478927) |
| MOUNA BRITEL et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Objectors and Respondents. | |

It is ordered that the opinion filed herein on April 23, 2015, be modified as follows:

On page 1, in the case title, the name "Jackie Stennett" is changed to "Jackie S."

On page 2, in the first paragraph, second sentence change the name Jackie Stennett to "Jackie S."

On page 5 , in the first full paragraph, line 5, delete the name "Stennett" and in its place insert "[S.]"

At the end of the last paragraph on page 23, after the citation ending with "*Apfel*, *supra*, 177 F.3d at p. 894.)" add as footnote 12 the following footnote:

[12] On petition for rehearing, Jackie notes, inter alia, that we did not discuss the case of *Arizmendi v. System Leasing Corp.* (1971) 15 Cal.App.3d 730. That is true, for at least one good reason. *Arizmendi* was not cited by any party to this appeal, nor by amici. Under a former version of the wrongful death statute, *Arizmendi* held that a nonmarital child has standing to sue for the wrongful death of a parent, despite not qualifying as an heir under former law, because to hold otherwise would deny the child equal protection of the law under the Fourteenth Amendment to the United States Constitution. (*Id*. at p. 737.) The *Arizmendi* court relied on the decision of the United States Supreme Court in *Levy v. Louisiana* (1968) 391 U.S. 68, which held that a Louisiana statute, as interpreted by its highest court, denied equal protection of the law to nonmarital children by denying them standing to bring an action for the wrongful death of their biological parent. In *Lalli*, *supra*, 439 U.S. at p. 268, footnote 6, the high court distinguished *Levy*, stating: "The presence in this case of the State's interest in the orderly disposition of a decedent's property at death distinguishes it from others in which that justification for an illegitimacy-based classification was absent," citing, inter alia, the *Levy* decision. Thus, the question becomes whether the California statute governing standing to sue for wrongful death (Code Civ. Proc., § 377.60), interpreted by the courts as being governed by the intestacy laws, survives an equal protection challenge under the rationale of *Levy* and *Arizmendi*. (See, e.g., *Cheyanna*, *supra*, Cal.App.4th at p. 865 ["standing to bring a wrongful death action remains linked to the intestacy laws"].) *Lalli* suggests the equal protection analyses of the wrongful death statute and the intestacy statute differs because the state's interest in maintaining disparate treatment of marital and nonmarital children differs under each statute.

In her petition for rehearing Jackie attempts to shoehorn the *Arizmendi*/*Levy* equal protection analysis into this case by asserting "this is a wrongful death case." But this is not a wrongful death case. This appeal was taken from competing petitions in the probate court for letters of administration and to determine heirship. Accordingly, our opinion deals *only* with the heirship question. Whether the wrongful death statute, as interpreted by the courts, survives an equal protection challenge by a nonmarital child has not been litigated in this case, either in the trial court or here, and we express no opinion on the issue. The equal protection issue under the wrongful death statute is more appropriately litigated in a suit for the wrongful death of Amine.

The petition for rehearing is DENIED.

The modification does not change the judgment.

_____
IKOLA, J.

WE CONCUR:


_____
ARONSON, ACTING P. J.


_____
FYBEL, J.

Filed 4/23/15 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

Estate of AMINE BRITEL, Deceased.

| | |
|---|---|
| JACKIE STENNETT et al., | G049161 |
| Petitioners and Appellants, | (Super. Ct. No. 30-2011-00478927) |
| v. | O P I N I O N |
| MOUNA BRITEL et al., | |
| Objectors and Respondents. | |

Appeal from an order of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed.

Law Offices of Debra Graynom-Daly, Debra Graynom-Daly; Law Offices of Diane Corwin, Diane Corwin; Ferguson Case Orr Paterson, Wendy C. Lascher, and John A. Hribar for Petitioners and Appellants.

Bidna & Keys, Howard M. Bidna, and Richard D. Keys for Objectors and Respondents.

Public Counsel and Lisa R. Jaskol for Women Lawyers Association of Los Angeles, The Harriet Buhai Center for Family Law, and Public Counsel as Amicus Curiae on behalf of Appellant.

\*        \*        \*

Amine Britel died intestate in 2011. Appellant Jackie Stennett, the mother of A.S., a child born out of wedlock, petitioned to administer Amine's estate and for A.S. to be declared Amine's heir under Probate Code section 6453, subdivision (b)(2) (section 6453(b)(2)).[1] Under section 6453(b)(2), a nonmarital child may establish that he or she is the natural child of an intestate decedent by proving the decedent "openly held out the child as his own."

The court denied Jackie's petitions. It granted the petition of respondent Mouna Britel (Amine's adult sister) to administer Amine's estate, which petition listed respondent Rhita Bhitel (Amine's mother) as Amine's surviving parent.

We affirm the court's order. In doing so, we conclude section 6453(b)(2)'s phrase, "openly held out," requires the alleged father to have made an unconcealed affirmative representation of his paternity in open view. We also conclude substantial evidence supports the court's finding Amine did not openly hold out A.S as his child. Finally, we conclude section 6453(b)(2) does not violate the state or federal equal protection rights of nonmarital children or of nonmarital children who can prove paternity using DNA tests.

FACTS

*Evidence prior to A.S.'s birth*

In the fall of 1999, Amine and Jackie met at Harvard Business School and developed a romantic relationship. In the early summer of 2000, they graduated. Jackie went to work in Atlanta, Georgia, while Amine moved to Newport Beach, California.

---

[1] All statutory references are to the Probate Code unless otherwise stated. We sometimes refer to children born out of wedlock as nonmarital children.

For convenience and to avoid confusion, we sometimes refer to the parties and the decedent by their first names. We mean no disrespect.

In August 2000, Jackie phoned Amine and told him she was pregnant. The next day, Amine sent Jackie an e-mail message saying he was "devastated," he would never be able to share the news with his parents, and that having a child out of wedlock was contrary to his Muslim religion and his culture and would bring him "a total shame [he would] have to bear for the rest of [his] life." Amine continued: "Please understand that I do love you but I am just not ready to be a father right now. I want us to have a child through a legitimate marriage and not outside of wedlock. We need to live together, learn about each other, and then make a committment [*sic*] for life. I perceive marriage as a very serious engagement. I was devastated for the past two years as a result of a bad marriage. In all fairness, I believe I should be a part of this decision. [¶] It is important for us to meet to discuss this issue as soon as possible and find a suitable arrangement for both of us."

Later that month or possibly in early September, Jackie visited Amine in California for three or four days. She had initially planned to stay around a week, but the trip was cut short and she returned to Atlanta. Within the next few days, Amine and Jackie spoke by phone between five to 10 times. The end result was that Amine told Jackie not to contact him again and that he did not want her or the baby to be in touch with him or his family.

Amine told his best friend, Youssef Choukri, that Jackie said she was pregnant with his baby, and that his having a child out of wedlock would bring shame to his family (who were highly regarded in Morocco) and might possibly cause Amine to be disinherited. Amine initially told Choukri he was not sure whether Jackie was really pregnant, but that he had told Jackie that if she was indeed pregnant, he would like her to have an abortion.

In late 2000 or early 2001, Amine told Choukri that Jackie had had an abortion. Amine and Choukri never discussed the matter again.

At trial, Jackie testified she never told Amine she had had an abortion.

3

*Evidence after A.S.'s birth*

A.S. was born to Jackie in February 2001. Amine is not listed as the father on A.S.'s birth certificate. Prior to Amine's death, Jackie never sought a paternity order to determine whether Amine was A.S.'s father. Amine never provided any financial support to A.S., never met her, and never communicated with her.

For many years, Jackie comported with Amine's request that she not contact him. Then, in November 2006, Jackie sent Amine an e-mail message, which stated in part, "Per your last request I have kept my distance from you for the past six years." Jackie's e-mail message informed Amine that A.S. wanted a relationship with him.

Amine did not respond to Jackie's e-mail message, so Jackie phoned him. In the phone call, Jackie told Amine that A.S. asked about him and wanted him in her life. Amine was "terse and cold," asked Jackie not to phone him again, and made it clear he wanted nothing to do with Jackie or A.S. This phone call and Jackie's e-mail message were the only communications between Jackie and Amine from the time A.S. was born until Amine's death.

Amine was close with his family members, but never told them he had a child.

In February 2011, Amine was 41 years old, and a world class bicyclist. He was riding his bicycle in broad daylight, when he was struck and killed by a drunk, texting driver. At the time of his death, Amine was not married and had no domestic partner. He died intestate.

Jackie never sought a paternity order while Amine was alive because she wanted him "to participate when he was ready and by his own choice," and she did not "want to force his hand."

Over respondents' objection, the court admitted into evidence a DNA test showing a 99.9996 percent probability that Amine was A.S.'s father.

4

*The court's ruling*

The court found Jackie's testimony was "not convincing"[2] and that Choukri was a credible witness. The court ruled: "The evidence submitted on the question of whether Amine Britel held out [A.S.] as his own child was disputed. After consideration and weighing of all testimony and evidence . . . , and the demeanor and credibility of the witnesses, the Court finds that Jackie Stennett did not carry her burden of establishing by clear and convincing evidence that Amine Britel openly held out [A.S.] as his own child in accordance with [section] 6453(b)(2). The evidence presented to suggest that Amine Britel held out [A.S.] as his own child is thin, at best . . . ."

In reaching its ruling, the court struggled with the statement in *Estate of Burden* that section 6453(b)(2)'s phrase, "'openly held out,' is synonymous with 'acknowledge'" (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1028 (*Burden*)) and that "acknowledge" means to ""concede to be real or true . . . [or] admit"" (*id*. at p. 1029). The court stated: "[I]f it wasn't for the *Burden* case, the court would be looking at the words of the statute itself, whether Amine Britel openly held out [A.S.] as his own. [¶] And the answer to that would be a clear no . . . ." Ultimately, the court concluded Amine had not openly held out A.S. as his own child.

The court denied Jackie's petitions for determination of heirship and for letters of administration, and granted Mouna's petition for letters of administration. By doing so, the court ruled that Amine's mother Rhita is his sole heir.

---

[2] The court further found the testimony of Henry Young, a witness called by Jackie, was not credible.

5

*I. AMINE DID NOT OPENLY HOLD OUT A.S. AS HIS CHILD*

Relying on *Burden*, *supra*, 146 Cal.App.4th 1021, Jackie contends Amine openly held out A.S. as his daughter within the meaning of section 6453(b)(2) and therefore the court erred by denying her petition for A.S. to be determined Amine's natural child and sole heir.

"Intestate succession is governed entirely by statute." (3 Blaylock et al., Cal. Probate Practice (2015) § 23.06[1][a], p. 23-77; § 6400.) "The *heirs* of a person are those whom the law appoints to succeed at the decedent's death to his or her estate in case of intestacy, by virtue of the statutes of succession." (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 74, p. 137.)

Section 6400 et seq. governs intestate succession. As relevant here, if there is no surviving spouse or domestic partner of an intestate decedent, the intestate estate passes to the decedent's "issue" (§ 6402, subd. (a)), or if there is no surviving issue, to the decedent's "parent or parents" (*id.*, subd. (b)). "'Issue' of a person means all his or her lineal descendants of all generations, with the relationship of parent and child at each generation being determined by the definitions of child and parent." (§ 50.)[3]

---

[3] Jackie argues DNA evidence establishes as a matter of law that A.S. is entitled to inherit from Amine. Relying on section 50's definition of "issue" as the "lineal descendants of all generations," she argues that "biological proof of paternity . . . definitively establishes that a child is the father's lineal descendant." Without further analysis, she concludes that — because a decedent's "issue" is entitled to inherit when there is no surviving spouse under section 6402, subdivision (a) — consequently A.S. is entitled to inherit.

We reject her contention. The argument leaves out part of section 50's definition of "[i]ssue." Under that definition, a biological "lineal descendant[]" must also be in the "relationship of parent and child" with the decedent. Section 50 further specifies that the relationship of parent and child must be "determined by the definitions of child and parent." The definitions of child and parent in sections 26 and 54, respectively, refer to entitlements to intestate succession established under the Probate

Section 6450 et seq. (chapter 2 of part 2 of division 6 of the Probate Code (chapter 2)) governs the relationship of parent and child. Under section 6450, "for the purpose of determining intestate succession," the "relationship of parent and child exists between a person and the person's natural parents, regardless of the marital status of the natural parents" (*id*., subd. (a)), and "between an adopted person and the person's adopting . . . parents" (*id*., subd. (b)).

Jackie contends biological parents are, by definition, natural parents within the meaning of section 6450, subdivision (a). Not so. Section 6450 is expressly "[s]ubject to the provisions of" chapter 2. Section 6453, also contained in chapter 2, governs "whether a person is a 'natural parent' as that term is used in this chapter."[4]

At issue here is subdivision (b)(2) of section 6453. Under section 6453(b)(2), a natural parent and child relationship may be established when "[p]aternity is established by clear and convincing evidence that the father has openly held out the child as his own."[5]

_____

Code (of which, § 6453 governs who is a natural parent).

[4] Section 6453 provides "the exclusive means for determining paternity" in intestacy proceedings, other than fatherhood by adoption. (*Estate of Chambers* (2009) 175 Cal.App.4th 891, 896 (*Chambers*); 14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 94, p. 159 [§ 6453 is "[e]xclusive basis for paternity in intestacy proceedings," italics omitted]; *Estate of Sanders* (1992) 2 Cal.App.4th 462, 469-471 [predecessor statute to § 6453 governed paternity determination for purposes of intestate succession]; *Burden*, *supra*, 146 Cal.App.4th at pp. 1030-1031 [same, concerning § 6453].) DNA evidence is irrelevant to the inquiry under section 6453(b)(2). (*Estate of Sanders*, at pp. 477-478.)

[5] The full text of section 6453 states: "For the purpose of determining whether a person is a 'natural parent' as that term is used in this chapter: [¶] (a) A natural parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act [Fam. Code, § 7600 et seq.]. [¶] (b) A natural parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established by an action under subdivision (c) of Section 7630 of the Family Code unless any of the

Thus, we must determine whether Jackie established by clear and convincing evidence under section 6453(b)(2) that Amine openly held out A.S. as his own child. To resolve this issue, we independently construe section 6453(b)(2)'s phrase, "openly held out the child as his own." (*Estate of Joseph* (1998) 17 Cal.4th 203, 216-217; *Burden*, *supra*, 146 Cal.App.4th at pp. 1025-1026.) We then review for substantial evidence the court's finding Jackie failed to prove by clear and convincing evidence that Amine openly held out A.S. as his own child. (*Estate of Joseph*, at p. 217; see *Burden*, at p. 1026.)

---

following conditions exist: [¶] (1) A court order was entered during the father's lifetime declaring paternity. [¶] (2) Paternity is established by clear and convincing evidence that the father has openly held out the child as his own. [¶] (3) It was impossible for the father to hold out the child as his own and paternity is established by clear and convincing evidence. [¶] (c) A natural parent and child relationship may be established pursuant to Section 249.5 [child posthumously conceived using decedent's genetic material]."

Family Code section 7630, subdivision (c) (concerning standing to bring an action to establish a parent-child relationship) deals "essentially with orphans or children whose fathers are not wed to their mothers and who do *not* receive them into their home." (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1207; see 14 Witkin, Summary of Cal. Law, *supra*, Wills and Probate, § 94, p. 158 [Fam. Code, § 7630, subd. (c) applies when there is "no presumed father or presumed father [is] deceased"].)

Neither party contends section 6453, subdivision (a) applies here. Indeed, *Chambers* held section 6453, subdivision (a) is inapplicable under these circumstances: "[W]hen a child born out of wedlock wants to show he is the natural child of a man who died without leaving a will, if the child relies on proof that the alleged father openly held him out as his own child, he must do so by clear and convincing evidence" under section 6453(b)(2) (*Chambers*, *supra*, 175 Cal.App.4th at p. 896), not by attempting to rely "on Family Code section 7611[, subdivision (d)] by way of . . . section 6453, subdivision (a)" (*id*. at p. 895).

We have not found, nor have the parties directed us to, any published cases interpreting section 6453, subdivision (b)(3) other than *Cheyanna M. v. A.C. Nielsen Co.* (1998) 66 Cal.App.4th 855, 877 (*Cheyanna*), which stated: "[T]he legislative history indicates that the 'impossibility' provision was enacted to cover the situation . . . where the father dies before the child is born."

*A. Section 6453(b)(2)'s phrase, "openly held out," requires an unconcealed affirmative representation of paternity in open view*

Jackie contends no public statement or public display is required to satisfy section 6453(b)(2)'s "openly held out" standard. In her view, the lone requirement is "that the father acknowledge the fact of fatherhood to someone at some time regardless of whether the father remains silent as to that status with respect to others including family members." She contends Amine satisfied this requirement by, at some point during Jackie's pregnancy, (1) expressing an acceptance of paternity (even a grudging one) to Jackie or Choukri, or (2) failing to deny to Jackie or Choukri that he was the father.

Jackie relies on *Burden's* statement that section 6453(b)(2)'s phrase "openly held out' is synonymous with 'acknowledge[d]'" (*Burden*, *supra*, 146 Cal.App.4th at p. 1028), and that "'acknowledge'" means to "'show by word or act that one has knowledge of and agrees to (a fact or truth)" or admits or concedes it to be true (*id*. at p. 1029). Thus, Jackie contends Amine openly held out A.S. to be his child when he privately conceded during the pregnancy that he fathered her unborn child.

Respondents counter that a private acknowledgement of paternity does not satisfy the "openly held out" standard.

Under the rules of statutory construction, a "'statute's plain meaning controls . . . unless its words are ambiguous.'" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387-388.) We give the statute's words "'their usual and ordinary meaning.'" (*Id.* at p. 387.) If possible, we give significance to every word. (*Burden*, *supra*, 146 Cal.App.4th at p. 1027.) Only if the statutory language is ambiguous may we "'consider other aids, such as the statute's purpose, legislative history, and public policy.'" (*Imperial,* at p. 388.)

Accordingly, we consider the usual and ordinary meaning of each term in section 6453(b)(2)'s phrase "openly held out." The adverb, "openly," has several dictionary definitions that might apply here: (1) "freely and without concealment"

9

(Webster's 3d New Internat. Dict. (2002) p. 1580, col. 2); (2) "without concealment, deception, or prevarication, esp. where these might be expected" (New Oxford American Dict. (3d. ed. 2010) p. 1228, col. 3); and (3) "frankly or honestly" (*ibid*). Another dictionary, while not containing a separate definition for the adverb "openly," defines the adjective "open" (in this context) as "completely free from concealment" and "exposed to general view or knowledge." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 811, col. 2.)

Two of the three dictionaries mentioned above contain a definition (in this context) of the verb "hold out:" (1) "to make out to be: REPRESENT" (Webster's 3d New Internat. Dict., *supra*, p. 1079, col. 2); and (2) "to present as something realizable: PROFFER"; or "to represent to be" (Merriam-Webster's Collegiate Dict., *supra*, p. 552, col. 1).

Consistent throughout these dictionary definitions is the notion of an *affirmative* representation being made in an unconcealed manner, not a mere acknowledgment of paternity nor an admission of parentage inferred from a failure to deny. But the ambiguity debated by the parties remains. An unconcealed affirmative representation could include a representation made "frankly or honestly" to a single person, even if done secretly and in private, if we adopt the New Oxford American Dictionary's alternative definition of "openly." On the other hand, an unconcealed affirmative representation could be construed to require a *public* representation, i.e., one that is "done . . . in open view" (New Oxford American Dict., *supra*, p. 1411, col. 1), or "exposed to general view" (Merriam-Webster's Collegiate Dict., *supra*, p. 941, col. 2).

Under the rules of statutory construction, we may resolve this ambiguity by interpreting section 6453(b)(2) to effectuate the statute's purpose. (*Burden*, *supra*, 146 Cal.App.4th at p. 1027.) The purposes of the intestacy succession statutes are (1) to carry out the decedent's "likely intent at the time of death" as to the distribution of his or her estate, and (2) to do so in an efficient and expeditious manner. (*Estate of Joseph*, *supra*,

10

17 Cal.4th at p. 212; *Burden*, at p. 1027.)  For the reasons discussed below, these purposes are best served by construing "openly held out" to require an unconcealed affirmative representation of paternity in open view.

Such a construction serves a "principal goal[] of intestacy law." (Pendleton, *Intestate Inheritance Claims: Determining A Child's Right to Inherit When Biological and Presumptive Paternity Overlap* (2008) 29 Cardozo L.Rev. 2823, 2826.) Intestacy law strives to effectuate the decedent's likely intent in the distribution of his property.  A man who represents his paternity in open view is more likely to intend for his estate to pass to the child.  "[I]t makes sense that a decedent would intend his estate to pass to a child he actively raised and nurtured within his family.  On the other hand, it is less logical to presume that a decedent would intend to pass his estate to a child he may not even have known, simply on account of a biological connection or legal presumption."  (*Id.* at pp. 2826-2827, fns. omitted.)

Our construction of "openly held out" also serves the second goal of intestacy law, i.e., to efficiently and expeditiously carry out the decedent's probable intent.  When an affirmative representation of paternity is made in open view, clear and convincing evidence of it is more likely to exist.  This "'injects a strong dose of certainty into' such matters" and "eliminates, or at least reduces, marginal claims."  (*Estate of Joseph*, *supra*, 17 Cal.4th at p. 213.)  Conversely, if a secret acknowledgment were sufficient — such that the decedent's family members, friends, or estate administrator were unaware of the putative child's existence — no timely notice of the probate proceedings would be given to the potential heir.  (*Lalli v. Lalli* (1978) 439 U.S. 259, 270 (*Lalli*).)  This could cause disruptions in the probate proceedings, such as delaying inheritance and finality in estate administration.  (*Ibid.*)

We conclude section 6453(b)(2) requires an affirmative representation of paternity that is unconcealed and made in open view.  But although the representation must be a public one, in the sense of being made in open view, the statute does not

11

require an announcement to the world, an official action, or an affectionate fatherly intent.

Each case depends upon its own circumstances as to whether an affirmative representation was unconcealed and made in open view. (See *Estate of Baird* (1924) 193 Cal. 225, 277 (*Baird*).) *Baird*, although it interpreted an *adoption* statute,[6] provides some potentially useful general guidelines: "While it is not required in order to constitute public acknowledgment that the father declare his paternity under all circumstances, it would be opposed to the idea of public acknowledgment if he deliberately refrained from declaring his paternity when the occasion would naturally demand it; or misrepresented the fact, or remained silent when he would reasonably be expected to announce he was the father of the child, as, for instance, in the case of immediate relatives." (*Id.* at p. 276.) Nor does a person publicly acknowledge a child by revealing the child's existence to persons who are not "likely to make public what [the decedent] had said to them on such a subject, but rather to accept it as a matter of confidence, to be kept secret.'" (*Id.* at p. 275.)

1. To the Extent *Burden* Holds that a Private Acknowledgment of Paternity is Synonymous with Openly Holding Out the Child As One's Own, We Disagree

*Burden* (the case on which Jackie relies) states that section 6453(b)(2)'s phrase "'openly held out' is synonymous with 'acknowledge[d],'" i.e., admitted or conceded. (*Burden*, *supra*, 146 Cal.App.4th at p. 1028, *id*. at p.1029.) If the *Burden* court intended by this statement to hold that a private admission of paternity without more is sufficient to satisfy the "'openly held out'" requirement, we respectfully disagree. Arguably, the statement is *dictum*, and the *Burden* court did not mean to hold that a private acknowledgment is sufficient, since the court recognized the decedent there "did

---

[6] The issue in *Baird* was whether the decedent had adopted a nonmarital child "by publicly acknowledging it as his own" within the meaning of former Civil Code section 230. (*Baird*, *supra*, 193 Cal. at p. 230.)

more than privately acknowledge" the nonmarital son. (*Id.* at p. 1029.) Indeed, the father in *Burden* affirmed his paternity in open view "on a number of occasions to a number of people, both orally and in writing" (*id*. at p. 1030), including his sister and the nonmarital son (*id.* at p. 1024). As a result, the father-son relationship was well-known: "[E]veryone in the family knew [that the nonmarital son] was [the alleged father's] son" (*id.* at p. 1025), and the son had a close relationship with the alleged father's mother and siblings (*id.* at pp. 1024-1025).

Although we are uncertain whether the *Burden* court's statement was intended to equate a private admission of paternity with the "openly held out" requirement of section 6453(b)(2), Jackie has certainly interpreted it that way. Accordingly, to the extent the *Burden* court held that a private admission of paternity is sufficient to satisfy the "openly held out" standard, we now explain the reasons for our disagreement. In doing so, we assume for purposes of our discussion that the *Burden* court *did* hold that a private admission of paternity was sufficient.

Because *Burden* was a "case of first impression" in construing the "openly held out" standard of section 6453(b)(2) (*Burden*, *supra*, 146 Cal.App.4th at p. 1023), the appellate court looked for guidance to cases interpreting other statutes. The court turned first to Family Code section 7611, subdivision (d) (Family Code section 7611(d)), which establishes a rebuttable presumption of parentage under the Uniform Parentage Act for a person who receives a child into his or her home and openly holds out the child as his or her natural child. Unfortunately, in our view, the *Burden* court erroneously concluded that "[n]umerous appellate opinions . . . have interpreted Family Code section [7611(d)'s] use of the term 'acknowledge' as a synonym for 'openly holds out.'" (*Burden*, at p. 1028.) We find two flaws with this analysis.

13

First, Family Code section 7611(d) does *not* use the term "acknowledge." Instead, it uses the phrase "openly holds out."[7]

Second, three of the six cases cited by *Burden* specify that Family Code section 7611(d) requires a *public* acknowledgment. (*In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1357 ["openly and publicly acknowledged paternity"]; *In re Julia U.* (1998) 64 Cal.App.4th 532, 541 ["public acknowledgment of paternity"]; *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652 ["openly and publicly admit paternity"]; see also *Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 857 ["publicly acknowledging paternity and receiving the child into his home"].) In a fourth case, the father was present at the child's birth, was listed on the birth certificate, and was represented by the mother "to the world" as the father. (*Brian C. v. Ginger K.*, *supra*, 77 Cal.App.4th at p. 1221.) *Brian C.* concluded the Family Code section 7611(d) presumption of paternity was "the product of one year's living with the child followed up with visitation after the relationship with the mother ended." (*Ibid.*) *Brian C.* did not address whether a private admission of paternity satisfied the "openly held out" standard. (*Ibid.*) A fifth case briefly mentions "receiving and acknowledging" as a shorthand description of Family Code section 7611(d)'s language in a footnote. (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 938, fn. 5.) *Dawn D.* does not address whether a private admission of paternity satisfies the "openly held out" standard. The last case uses the word "acknowledged" as a synonym for "openly held out" in holding that Family Code section 7611(d) did "not have any reasonable application to surrogacy cases." (*In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1226.) *Moschetta* does not address whether a private admission of paternity is sufficient.

_____

[7] Under Family Code section 7611(d), a person is a presumed parent if "[t]he presumed parent receives the child into his or her home and openly holds out the child as his or her natural child." Since its inception in 1992, the statute has never contained the word "acknowledge." (Stats. 1992, ch. 162, § 10, as amended by Stats. 1993, ch. 219, § 176; Stats. 1994, ch. 1269, § 53; Stats. 2004, ch. 775, § 1; Stats. 2013, ch. 510, § 3.)

*Burden* also based its statutory construction on section 6452, which governs the less common situation where a *parent* seeks to inherit from a predeceased *child*. Under section 6452, as then in effect, a natural parent could not inherit from a nonmarital child unless the parent had "acknowledged the child" and contributed to the child's support or care. (*Burden*, *supra*, 146 Cal.App.4th at p. 1028.) But section 6452 demonstrates the Legislature uses the word "acknowledge" with no adverbs when appropriate.

Finally, *Burden* noted that, prior to 1993, the predecessor to section 6453(b)(2) required the father to "'openly and notoriously [hold] out the child as his own.'" (*Burden*, *supra*, 146 Cal.App.4th at p. 1028.) But by deleting "notoriously," the Legislature simply discarded an outdated, pejorative adverb for having a child out of wedlock. (See, e.g., Webster's 3d New Internat. Dict., *supra*, p. 1545, col. 2 [defining "notorious," inter alia, as "widely and unfavorably known or discussed for something reprehensible or scandalous or for some negative quality or trait"].)

2. In the Absence of a Court Decree or Enforceable Contract, a Decedent's Estate is Not Generally Liable for the Support of a Minor

In her opening brief on appeal, Jackie briefly suggests that the law governing *child support* should apply to a nonmarital child's inheritance. She urged the same contention even more forcefully at oral argument. She suggests: "A man who impregnates a woman cannot evade his obligation to support his child simply because he is 'not ready to be a father' or he believes that having a child would embarrass his family. The same rule should prevail with respect to intestacy."

But the law of intestacy is distinct from child support law, as revealed by an examination of the relevant history and purposes of intestate succession law. "At common law the court had no power to direct the payment of money out of the estate of a deceased person for the support and education of his family, to the exclusion of his

15

creditors or heirs at law. Such power to do so as the court now has comes entirely from statute." (*In re Estate of McSwain* (1917) 176 Cal. 280, 283; see *Jacobs v. Gerecht* (1970) 6 Cal.App.3d 808 [affirming trial court's sustaining of demurrer to complaint alleging common law claim for child support against decedent father's estate].) The only statutory provisions for support of a minor child by a decedent's estate are found in: (1) section 6540, subdivision (a)(2), providing for a family allowance during administration of the probate estate; and (2) Family Code section 3952, providing that where "a parent chargeable with the support of a child dies leaving the child chargeable to the county," the county "may claim provision for the child's support from the parent's estate."

In contrast, it has long been the rule that "the obligation of a father to support his minor child which is fixed by divorce decree or property settlement agreement, does not cease upon the father's death, but survives as a charge against his estate." (*Taylor v. George* (1949) 34 Cal.2d 552, 556.) In other words, claims for child support based upon divorce decrees or property settlement agreements may be enforced against the estate as ordinary creditor claims under section 9000 et seq.

Just as divorce decrees and settlement agreements can create child support obligations, paternity suits brought during a father's lifetime under Family Code section 7630 enforce his duty to support his children. "Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights." (Fam. Code, § 7570, subd. (a).) Furthermore, in paternity actions, Family Code section 7555 establishes a rebuttable presumption of paternity based on DNA tests.

Consequently, during a man's lifetime, he can be mandated by court order or by contractual agreement to provide for his child's support, regardless of the father's personal preferences. And, if the father dies during the child's minority, his support

16

obligation continues as a claim against his estate. (*Taylor v. George*, *supra*, 34 Cal.2d at p. 556.)

But once a man dies, the laws of testate and intestate succession focus on his intent (or his likely intent if he died intestate) in the distribution of his estate. The emphasis at that stage is on the decedent's property rights. The "goal of carrying out the presumed intent of most decedents follows from the concept of private property, a concept at the heart of American property law. Connected to the idea that individuals can own and control property, separate and apart from ownership by the family unit or other social unit, is the idea that an individual property owner should be able to control the disposition of the property at his or her death." (Gary, *Adapting Intestacy Laws to Changing Families* (2000) 18 Law & Ineq. 1, 8 (Gary).)

We recognize this emphasis on property rights represents a policy choice, but the choice is within the Legislature's purview and is consistent with long-standing tradition. "Intestacy statutes have, since the first adoption of such statutes in this country, given a decedent's property to those family members closest to the decedent." (Gary, *supra*, 18 law & Ineq. at p. 2.)[8] Persons can "opt out of the intestacy statute either by executing a will or by holding title to property in a manner that provides for the transfer of title at death by means other than the probate system." (*Id*. at p. 2, fn. omitted.) "Since each person is constitutionally free to dispose of his property in an unfettered

---

[8]    The article concludes: "The form of American families has changed and will continue to change. . . . Families create caring, nurturing and loving relationships that do not depend on formal requirements that the family members be related by blood, legal marriage or adoption to be considered family." (Gary, *supra*, 18 Law & Ineq. at p. 80.) "Intestacy laws should encompass the children of the new families such as stepchildren, children of gay and lesbian families, and children in families headed by opposite-sex, unmarried partners. [¶] This Article proposes statutory changes that . . . could begin to make intestacy statutes more inclusive and more useful. Intestacy laws should approximate the intent of the decedent and provide support, both economic and psychological, for all families." (*Ibid*.)

17

manner, it cannot be said that statutes reflecting the probable intent of individuals are unreasonable." (*Estate of Ginochio* (1974) 43 Cal.App.3d 412, 419.)

As respondents point out, the "issue here is not whether Amine had an obligation under the Family Code to support [A.S.] while he was alive." Jackie chose to wait for Amine to become ready to be A.S.'s father. She never brought a paternity action. Her decision carried the risk that Amine could die intestate while she waited for him to grow into fatherhood. Conversely, had she brought a paternity suit, Amine might have chosen to write a will excluding A.S.

*B.  Substantial evidence supports the court's finding Jackie failed to show Amine openly held out A.S. as his child*

Jackie argues undisputed evidence showed "Amine acknowledged paternity in his email to Jackie and his statements to his best friend." As a threshold matter, respondents contend Amine's actions prior to A.S.'s birth are irrelevant to this issue under *Cheyanna*, *supra*, 66 Cal.App.4th 855. *Cheyanna* held the term "child," as used in section 6453(b)(2), does not include an unborn child, and therefore it is impossible for a man to hold out a fetus as his child. (*Id.* at p. 874.) Jackie counters that *Cheyanna's* holding does not apply here. We need not resolve this issue because substantial evidence supports the court's finding, even taking into account the prebirth evidence.

Substantial evidence shows Amine never made an unconcealed affirmative representation of his paternity in open view. Prior to A.S.'s birth, Amine made it clear, in a private e-mail message to Jackie, that he could never tell his parents about the pregnancy; in other words, that he would conceal it from them. The court found Amine "maintained a close, open and loving relationship with his family." Yet, he never told them about the pregnancy or, later, the child. He told his best friend Choukri that Jackie had had an abortion, and never mentioned the matter again to Choukri. There is no evidence that after A.S.'s birth, Amine acknowledged paternity in any way. Indeed, in

18

late 2006, less than four and one-half years before his death, Amine told Jackie not to contact him again and that he wanted nothing to do with her or A.S. In sum, substantial evidence supports the court's finding Amine did not openly hold out A.S. as his child.

## II. *SECTION 6453 DOES NOT VIOLATE THE STATE OR FEDERAL EQUAL PROTECTION CLAUSES*

Jackie contends that even if the court correctly interpreted and applied section 6453, the statutory scheme violates the equal protection rights of nonmarital children because marital children enjoy a rebuttable presumption of a natural parent-child relationship under section 6453, subdivision (a). Amici argue the statutory scheme violates the equal protection rights of nonmarital children who can prove paternity using DNA tests.

Whether a statutory classification is unconstitutional "depends upon the character of the discrimination and its relation to legitimate legislative aims." (*Mathews v. Lucas* (1976) 427 U.S. 495, 503-504.) The United States Supreme Court has generally applied an intermediate level of scrutiny to discriminatory classifications based on illegitimacy. (*Clark v. Jeter* (1988) 486 U.S. 456, 461 (*Clark*); *Astrue v. Capato* (2012) ___ U.S. ___, ___ [132 S. Ct. 2021, 2033].) "To withstand intermediate scrutiny, a statutory classification must be *substantially related* to an important governmental objective." (*Clark*, at p. 461, italics added.) The Supreme Court has explained why strict scrutiny does not apply: "[P]erhaps in part because the roots of the discrimination rest in the conduct of the parents rather than the child, and perhaps in part because illegitimacy does not carry an obvious badge, as race or sex do, [the] discrimination against illegitimates has never approached the severity or pervasiveness of the historic legal and political discrimination against women and [African-Americans]." (*Mathews*, at p. 506.) Although "illegitimacy is analogous in many respects to the personal characteristics that have been held to be suspect when used as the basis of statutory differentiations," the

19

Supreme Court has "concluded that the analogy [is] not sufficient to require 'our most exacting scrutiny.'" (*Trimble v. Gordon* (1977) 430 U.S. 762, 767 (*Trimble*).)[9]

Jackie contends the modern day accuracy of DNA tests compels the conclusion that section 6453 violates the equal protection rights of nonmarital children. She argues DNA proof of paternity eliminates the risk of fraudulent claims and therefore section 6453 no longer serves that state interest. Even if that were true, however, section 6453 effectuates the state's important interests in carrying out an intestate decedent's likely intent and in doing so efficiently.

Jackie relies on *Clark*, *supra*, 486 U.S. 461 and *Mills v. Habluetzel* (1982) 456 U.S. 91, both of which involved statutes of limitation for *paternity actions*, not intestate succession statutes. The state interests implicated in *Clark* and *Mills* differ from the legislative purposes underlying intestacy succession laws. Paternity actions enforce "the State['s] interest in ensuring that genuine claims for child support are satisfied" (*Clark*, at p. 462) and that a child may have a relationship with his or her father (*County of Shasta v. Caruthers* (1995) 31 Cal.App.4th 1838, 1841). California's intestate succession laws, in contrast, further the state's interest in carrying out the likely intent of

_____

[9] Amici argue the differential treatment of non-marital children who can prove paternity using DNA tests is subject to strict scrutiny analysis under the California Constitution. Amici rely on *Darces v. Woods* (1984) 35 Cal.3d 871, 892, which stated the California "equal protection clause is 'possessed of an independent vitality' from the Fourteenth Amendment." The challenged class in *Darces* was "citizen children eligible for governmental assistance" (*id*. at p. 874) who were denied a portion of their grant because they resided with siblings who were undocumented aliens (*id.* at p. 875). *Darces* held the classification was suspect at least in part because it "touche[d] upon two traits that have been historically disfavored — national origin and ancestry." (*Id.* at p. 893.) Accordingly, *Darces* is inapposite here.

Furthermore, section 6453 treats nonmarital children who can prove paternity using DNA tests identically to nonmarital children who cannot prove paternity using DNA tests. To do otherwise would raise independent equal protection concerns.

Because we reject amici's argument, we do not address respondents' contention the court improperly admitted the DNA evidence here.

20

a decedent, at the time of death, in the distribution of his or her estate.  As recognized by the United States Supreme Court, state intestacy laws embody "the popular view within the jurisdiction of how a parent would have his property devolve among his children in the event of death . . . ." (*Mathews v. Lucas*, *supra*, 427 U.S. at pp. 514-515.)

Jackie also relies on *Lalli*, *supra*, 439 U.S. 259, which involved intestate succession.  *Lalli* identified another state interest underlying laws limiting the right of nonmarital children to inherit from putative fathers who die intestate:  Unless reasonable restrictions are imposed, such inheritance can significantly disrupt the administration of estates (both intestate and pursuant to a will).  (*Id.* at p. 271.)

*Lalli* involved a constitutional challenge to a New York statute that allowed a nonmarital child to inherit from an intestate father only if a court had issued a paternity decree during the father's lifetime.  (*Lalli*, *supra*, 439 U.S. at pp. 261-262.)  Drafted by a state commission of experts "in the practical problems of estate administration" (*id.* at p. 269), the statute "was intended to soften the rigors of previous law which permitted illegitimate children to inherit only from their mothers" (*id.* at p. 266).  "Although the overarching purpose of the proposed statute was 'to alleviate the plight of the illegitimate child,' [the commission] considered it necessary to impose the strictures of [the challenged statutory provision] in order to mitigate serious difficulties in the administration of the estates of both testate and intestate decedents." (*Id.* at pp. 269-270.)  The commission recognized that a putative father often "'goes his way unconscious'" of the birth of a child.  (*Id.* at p. 269.)  The commission identified serious problems which would arise in both intestacy and will probate proceedings if nonmarital children were unconditionally entitled to notice and an opportunity to be heard.  For example, "'[h]ow does one cite and serve an illegitimate of whose existence neither family nor personal representative may be aware?  And of greatest concern, how [does one] achieve finality of decree in *any* estate when there always exists the possibility however remote of a

21

secret illegitimate lurking in the buried past of a parent or an ancestor of a class of beneficiaries?'" (*Id.* at p. 270.)[10]

In *Lalli*, a divided Supreme Court held the statute was "substantially related to the important state interests the statute is intended to promote" and therefore found no violation of the Equal Protection Clause. (*Lalli*, *supra*, 439 U.S. at pp. 275-276 (plur. opn. of Powell, J.).) Justice Powell's plurality opinion observed that the statute was intended "to ensure the accurate resolution of claims of paternity . . . , to minimize the potential for disruption of estate administration," and to permit a man to defend his reputation against unjust paternity claims. (*Id.* at p. 271.) The plurality held the statute bore a substantial relationship to those purposes: "The administration of an estate will be facilitated, and the possibility of delay and uncertainty minimized, where the entitlement of an illegitimate child to notice and participation is a matter of judicial record before the administration commences." (*Id.* at p. 271.)

*Lalli* recognized that in some cases, unfairness would result: "We do not question that there will be some illegitimate children who would be able to establish their relationship to their deceased fathers without serious disruption of the administration of estates and that, as applied to such individuals, [the statute] appears to operate unfairly. But few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results. Our inquiry under the Equal Protection Clause does not focus on the abstract 'fairness' of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment." (*Lalli*, *supra*, 439 U.S. at pp. 272-273.)

Here, section 6453, subdivision (b)(1), under which a paternity decree entered during the father's lifetime creates a natural parent-child relationship for purposes

---

[10] In California, "a petition for administration of a decedent's estate" must be served on "[e]ach heir of the decedent, *so far as known to or reasonably ascertainable by the petitioner."* (§ 8110, subd. (a), italics added.)

22

of intestate succession, is similar to (and more generous than) the New York statute upheld in *Lalli*.[11] Section 6453 provides two additional methods by which paternity can be established, i.e., pursuant to section 6453(b)(2)'s "openly held out" standard and section 6453, subdivision (b)(3)'s "impossibility" provision. Thus, *Lalli* upheld the constitutionality of a New York statute that was "similar [to], but even more restrictive" than, section 6453. (*Campbell ex rel. Campbell v. Apfel* (9th Cir. 1999) 177 F.3d 890, 894.)

As *Lalli* recognized, "the States have an interest of considerable magnitude" in "the just and orderly disposition of property at death." (*Lalli*, *supra*, 439 U.S. at p. 268.) Section 6453(b)(2)'s "openly held out" standard promotes the purpose of minimizing disruption of estate administration: If a putative father has *openly* held out a child as his own, the child is less likely to be a "'secret'" or "'unknown' illegitmate[]" with concomitant concerns of identification and finality discussed in *Lalli*, *supra*, 439 U.S. at page 270. Equally important, section 6453(b)(2) carries out the decedent's likely intent at the time of death as to the distribution of his estate. Because section 6453(b)(2) is substantially related to these important state interests, it does not violate the federal or state Constitutions. (*Estate of Sanders*, *supra*, 2 Cal.App.4th at pp. 476-477; *Estate of Ginochio*, *supra*, 43 Cal.App.3d at p. 416 [rejecting equal protection challenge under state and federal Constitutions to former Prob. Code, § 255, under which nonmarital child was heir of mother and of person who, in writing, acknowledged himself to be the father]; *Campbell ex rel. Campbell v. Apfel*, *supra*, 177 F.3d at p. 894.)

---

[11] The New York statute contained the additional requirement that the paternity proceeding have been "instituted during the pregnancy of the mother or within two years from the birth of the child." (*Lalli*, *supra*, 439 U.S. at p. 262.)

DISPOSITION


The order is affirmed.  Respondents shall recover their costs on appeal.



IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.


24

FYBEL, J., Concurring.

I have concurred in the majority's opinion because its analyses of Probate Code section 6453, subdivision (b), and the constitutional questions presented are correct. Under the facts of this case, a natural parent and child relationship cannot be established under that statute as between Amine Britel and A.S. because (1) no court order declaring paternity was entered during Amine's lifetime, (2) Amine did not openly hold A.S. out as his own child, and (3) it was not impossible for Amine to have held A.S. out as his own child. Under the authorities cited in the majority opinion, the statute is constitutional.

I write separately to invite the Legislature to revisit Probate Code section 6453, subdivision (b), in light of the current state of DNA science and the societal interest in protecting children. Specifically, I urge the Legislature to add to the list of conditions for proving the existence of a natural parent and child relationship that paternity may be established by DNA evidence if the father, during his lifetime, acknowledged fathering the child, regardless of whether he publicly or openly held out the child as his own.

In this case, it is without question that Amine is the father of A.S. The DNA test performed pursuant to court order found a 99.9996 percent probability that Amine was A.S.'s father. The statute as it currently stands does not address significant advances in genetic testing that have occurred since the statute was last substantively amended. This court may not, however, read into the statute an additional means for determining paternity in intestate succession cases. "The contention that scientific advances in genetic testing have rendered this construction of the statute obsolete by removing the uncertainty of proof that justified the restrictive nature of the statute is more appropriately addressed to the Legislature." (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 94, p. 159, citing *Estate of Sanders* (1992) 2 Cal.App.4th 462, 476.)

1

A purpose of the intestacy statutes is to effectuate the transfer of property the decedent would have wanted if he or she had made a will by determining the decedent's likely intent. (*Estate of Joseph* (1998) 17 Cal.4th 203, 212.) Another important purpose of intestacy statutes is to serve our societal interests and values. "At issue in thinking about intestacy statutes is not only what a decedent wants, but what society wants." (Gary, *Adapting Intestacy Laws to Changing Families* (2000) 18 Law and Ineq. J. 1, 13.) Probate Code section 6453, subdivision (b), as it now stands, addresses these societal interests and values in some respects. My suggestion is that the statute be amended to protect the intestate succession rights of those nonmarital children, especially minors, whose fathers have acknowledged them. This amendment would improve the statute by ensuring the financial well-being of an innocent child, even though his or her father did not openly hold him or her out as his own within the meaning of the statute as it is now worded.

California has a rich history of protecting and supporting children. Courts have consistently recognized the rights of children, including nonmarital children. (*Darces v. Woods* (1984) 35 Cal.3d 871, 891 ["innocent children cannot be explicitly disadvantaged on the basis of their status of birth"]; *Arizmendi v. System Leasing Corp.* (1971) 15 Cal.App.3d 730, 737 ["To grant the right to sue for the wrongful death of the natural father of a legitimate minor child, to such child, and at the same time, solely by reason of status created by legislative enactment, to deny such right to an illegitimate minor child appears to be an artificial, discriminatory barrier which should not be recognized or tolerated in the law."]; *Estate of Woodward* (1964) 230 Cal.App.2d 113, 118 [children born during or outside parents' marriage treated the same for purpose of determining parents' obligation of support].) The United States Supreme Court, too, has struck down laws discriminating against children whose parents were not married to each other when the children were born. (*Clark v. Jeter* (1988) 486 U.S. 456; *Pickett v. Brown* (1983) 462 U.S. 1; *Trimble v. Gordon* (1977) 430 U.S. 762; *Gomez v. Perez* (1973) 409

2

U.S. 535; *Weber v. Aetna Casualty & Surety Co.* (1972) 406 U.S. 164; *Glona v. American Guarantee & Liability Ins. Co.* (1968) 391 U.S. 73.)

Probate Code section 6453, subdivision (b) should be amended to permit establishment of a parent and child relationship by DNA evidence, and acknowledgement by the father that the child is his, albeit without publicly or openly holding out the child as his own. Accordingly, I respectfully urge the Legislature to permit children to inherit intestate based on (1) clear and convincing genetic evidence of paternity, and (2) clear and convincing evidence that the father, during his lifetime, acknowledged fathering the child.

FYBEL, J.