ARONSON, J.
*287 This case presents two issues: does the nonmarital biological child of an absentee father who never openly held her out as his own have standing under Code of Civil Procedure section 377.60 ( section 377.60 ) to sue for his wrongful death if she failed to obtain a court order declaring paternity during his lifetime?[1] If she does not have standing, does section 377.60 violate the state or federal equal protection clauses?
We conclude the child does not have standing under the circumstances presented here, and we find no equal protection violation. As explained below, the legislative history of California's wrongful death statute establishes that standing to sue for wrongful death turns on whether the plaintiff has a right to inherit from the decedent under California's intestate succession statutes. In this particular case, the child has no right to inherit from the decedent *876 because he never openly held her out as his own and because she *288 never obtained a court order declaring paternity during his lifetime. It follows that she does not have standing to sue for his wrongful death. Notably, a contrary conclusion would deprive the decedent's parents and siblings of standing to sue for his wrongful death. We cannot imagine the Legislature intended to confer wrongful death standing on a child who had no relationship whatsoever with the decedent to the exclusion of the decedent's other family members with whom he did have a relationship.
We also reject the appellant's equal protection argument. California's wrongful death standing rules do not categorically exclude nonmarital children. They confer standing on a variety of children - both marital and nonmarital - if they satisfy certain criteria concerning their relationship with the decedent during his lifetime. This is not a case where the state has created an insurmountable barrier to nonmarital children; to the contrary, a nonmarital child has multiple statutory avenues for establishing he or she has a right to inherit from the decedent under California's intestate succession laws and thus has wrongful death standing.
Nor do California's wrongful death standing rules illegally discriminate on the basis of gender. A state may validly impose different requirements for establishing natural parent status for birth mothers and biological fathers because mothers and fathers are not similarly situated when it comes to their role in becoming parents.
We therefore affirm the judgment dismissing the complaint for lack of standing.
I.
FACTS [2]
This case arises out of the death of Amine Britel, who was killed by a texting drunk driver at the age of 41. ( Estate of Britel, supra , 236 Cal.App.4th at p. 134, 186 Cal.Rptr.3d 321.) Britel never married, and he died intestate. ( Ibid . ) He was survived by his mother and his two adult sisters.
A.S. is Britel's biological child, as confirmed by DNA testing conducted after his death. A.S. was conceived during a brief relationship between Britel and A.S.'s mother, appellant Jacqueline Stennett (Jackie), when they were both graduate students. ( *289 Estate of Britel, supra , 236 Cal.App.4th at pp. 132-133, 186 Cal.Rptr.3d 321.) Several months after they parted ways, Jackie informed Britel of her pregnancy. ( Id. at p. 133, 186 Cal.Rptr.3d 321.) Britel felt he never could tell his family about having a child out of wedlock, and he told Jackie that he wanted no contact with her or the baby. ( Ibid . )
Jackie decided she wanted Britel " 'to participate when he was ready and by his own choice,' " so she never sought a court order declaring paternity during Britel's lifetime. ( Estate of Britel, supra , 236 Cal.App.4th at p. 134, 186 Cal.Rptr.3d 321.) A.S. was 10 years old when Britel died in February 2011. She never met Britel or had any relationship with him. ( Ibid . ) After Britel's death, Jackie filed a petition to have A.S. declared Britel's heir under the Probate Code's intestacy provisions. ( Estate of Britel, supra , 236 Cal.App.4th at p. 132, 186 Cal.Rptr.3d 321.) Acting as A.S.'s guardian ad litem, Jackie also filed a wrongful death complaint against the driver who killed Britel and the driver's parents *877 (collectively, the Millers), among others. The wrongful death action was stayed pending the heirship litigation in the probate court.
The probate court held that A.S. did not qualify as Britel's heir, and a different panel of this court affirmed that ruling. ( Estate of Britel , supra , 236 Cal.App.4th at pp. 132, 134, 186 Cal.Rptr.3d 321.) As this court explained, if an intestate decedent has no surviving spouse or domestic partner, as was the case here, the estate passes to the decedent's "issue," that is, his or her lineal descendants as determined by the statutory definitions of parent and child . ( Id. at pp. 135-136, 186 Cal.Rptr.3d 321 [citing Prob. Code, §§ 50, 6402 ].) These definitions provide that a parent-child relationship exists " 'between a person and the person's natural parents, regardless of the marital status of the natural parents.' " ( Ibid. [citing Prob. Code, § 6450, subd. (a) ].) Probate Code section 6453 governs "whether a person is a 'natural parent' " and provides, among other things, that a natural parent-child relationship may be "established by clear and convincing evidence that the parent has openly held out the child as his own." ( Prob. Code, § 6453, subd. (b)(2).)
Applying these provisions, this court concluded Britel did not openly hold out A.S. as his own and therefore A.S. did not qualify as his heir under Probate Code section 6453, subdivision (b)(2). ( Estate of Britel, supra , 236 Cal.App.4th at pp. 137-140, 186 Cal.Rptr.3d 321.) This court also rejected A.S.'s equal protection challenge to subdivision (b)(2), although it refrained from deciding the constitutionality of the wrongful death statute. ( Id. at pp. 145-148, fn.12, 186 Cal.Rptr.3d 321.)
After Estate of Britel was decided, the Millers moved for judgment on the pleadings against A.S. in the wrongful death action. The trial court granted their motion and dismissed the complaint for lack of standing. It reasoned that standing for wrongful death hinges on whether a plaintiff qualifies as the *290 decedent's heir under California's intestate succession statutes. It also rejected Jackie's equal protection challenge to the wrongful death statute. Jackie appealed.
II.
DISCUSSION
A. Standard of Review
We review de novo questions of statutory construction and the determination of a statute's constitutionality. ( Lee v. Hanley (2015) 61 Cal.4th 1225, 1232, 191 Cal.Rptr.3d 536, 354 P.3d 334 ; Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward (2011) 200 Cal.App.4th 81, 90, 133 Cal.Rptr.3d 155.)
B. A.S. Lacks Standing to Sue for Wrongful Death
1. General Principles Guiding Our Analysis
In California, a wrongful death cause of action "is wholly statutory in origin." ( Steed v. Imperial Airlines (1974) 12 Cal.3d 115, 119-120, 115 Cal.Rptr. 329, 524 P.2d 801 ( Steed ).) As our Supreme Court has explained, "the Legislature intends to occupy the field of recovery for wrongful death." ( Justus v. Atchison (1977) 19 Cal.3d 564, 575, 139 Cal.Rptr. 97, 565 P.2d 122 ( Justus ), disapproved on other grounds in Ochoa v. Superior Court (1985) 39 Cal.3d 159, 171, 216 Cal.Rptr. 661, 703 P.2d 1.) "Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.' " ( Ibid . )
*878 Thus, " 'the right to bring such an action is limited to those persons identified' " in the wrongful death statute, section 377.60. ( Scott v. Thompson (2010) 184 Cal.App.4th 1506, 1510, 109 Cal.Rptr.3d 846 ( Scott ); see Steed , supra , 12 Cal.3d at p. 119, 115 Cal.Rptr. 329, 524 P.2d 801 [" 'It is well settled that the right to bring an action for the wrongful death of a human being is limited to the persons described in [the statute]' "].) The category of persons eligible to bring wrongful death actions is strictly construed. ( Cheyanna M. v. A.C. Nielsen Co. (1998) 66 Cal.App.4th 855, 865, 78 Cal.Rptr.2d 335 ( Cheyanna M. ).)
The wrongful death statute provides in pertinent part: "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons ... [¶] (a) The decedent's surviving spouse, domestic partner, children , and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the *291 surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession." ( § 377.60, subd. (a), italics added.)[3] This appeal turns on the meaning of the word "children" and whether A.S. qualifies as Britel's "child" under section 377.60, subdivision (a). This is a question of statutory interpretation.
"In determining the meaning of the section, we are guided by the following established principles: '[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, [we] must look first to the words of the statute themselves, giving to the language its usual, ordinary import .... The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citation.]' " ( Walnut Creek Manor v. Fair Employment & Housing Com. (1991) 54 Cal.3d 245, 268, 284 Cal.Rptr. 718, 814 P.2d 704.)
" '[I]f the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs.' " ( Scott , supra , 184 Cal.App.4th at p. 1513, 109 Cal.Rptr.3d 846.) However, "[i]f the statutory language is susceptible of more than one reasonable interpretation, we must look to additional canons of statutory construction to determine the Legislature's purpose. [Citation.] 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' " ( McCarther v. Pacific Telesis Group (2010) 48 Cal.4th 104, 110, 105 Cal.Rptr.3d 404, 225 P.3d 538.) Committee reports and interpretive opinions of the Law Revision Commission are also entitled to great weight in discerning that intent. ( Hale v. Southern Cal. IPA Medical Group, Inc. (2001) 86 Cal.App.4th 919, 927, 103 Cal.Rptr.2d 773.)
2. The Term "Children" Is Ambiguous
Section 377.60 does not define the term "children." Jackie interprets "children" to *879 mean the decedent's biological children, whereas the Millers argue the term "children" is ambiguous.
The word "children," by itself, at first blush appears to be unambiguous: it is commonly understood to refer to one's offspring. Because we must *292 construe the text as a whole, however, we also must consider the context in which the word "children" is used. ( K Mart Corp. v. Cartier, Inc. (1988) 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 ["In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"].) Harmonizing the statutory language within the context of the law and its evident purpose is not reliance on an extrinsic source, but merely the best way to learn the meaning of a word.
The statute's overall purpose is to provide standing for specified persons most likely to have suffered damages from the loss of the decedent's companionship or financial support. ( Lattimore v. Dickey (2015) 239 Cal.App.4th 959, 968, 191 Cal.Rptr.3d 766 ( Lattimore ).) With this in mind, various questions arise concerning the precise meaning of the word "children." For example, does "children" refer only to biological children? What about adopted children? Stepchildren? Nonadopted stepchildren? Did the Legislature intend to confer standing to a decedent's biological children who were adopted by another person? Do the biological children of a decedent have standing if the decedent's parental rights were terminated? Does the statute confer standing to biological children of an absentee parent or biological children of a sperm or egg donor? Would adopting Jackie's argument exclude persons with whom the decedent had no biological relationship, but whom the decedent supported financially and emotionally and openly held out as his or her own children? What about the decedent's "natural child" - i.e., a child with whom the decedent had a parent-child relationship as defined by statute? Where exactly did the Legislature intend to draw that line? Answering that question requires more than a reference to how the word "child" is "commonly understood."
It bears noting that our Legislature has not always used the term "child" in a purely biological sense. The statutory definitions of "natural parent" and the parent-child relationship in Probate Code sections 6450, 6451, and 6453, which govern intestate succession, and Family Code sections 7601, 7611, and 7630, which govern when the rights and obligations of the parent-child relationship arise, illustrate this point.
Indeed, not all biological children necessarily meet the legal definition of "children." (See, e.g., Prob. Code, § 6451 [adoption severs the relationship of parent and child unless certain requirements are satisfied]; see also Prob. Code, § 6453 [setting forth an exhaustive list of situations when a person is presumed to be a child's natural parent, irrespective of biology]; Fam. Code, § 7611 [same].)
In sum, on closer inspection, it is evident the term "children" in the wrongful death standing statute is indeed susceptible of more than one *293 reasonable interpretation when viewed in context and in light of the wrongful death statute's purpose. We therefore must turn to the statute's legislative history to determine the Legislature's intent when it provided standing to "children." (See Cheyanna M., supra, 66 Cal.App.4th at p. 863, 78 Cal.Rptr.2d 335 ["Faced with two different statutory schemes for defining 'children,' *880 we examine the legislative history of the wrongful death statute for guidance."].)[4]
3. The Statute's Legislative History Confirms Wrongful Death Standing Remains Linked to Intestacy Laws
As discussed below, the legislative history confirms that when the Legislature used the term "children" in section 377.60, it referred to persons entitled to take from the decedent under California's intestate succession laws.
California's first wrongful death statute was enacted in 1862. (Stats. 1862, ch. 330, §§ 1-4, pp. 447-448.) In 1872, the statute was codified as former section 377 of the Code of Civil Procedure ( section 377 ). (See Historical and Statutory Notes, 14 West's Ann. Code Civ. Proc. (2004 ed.) § 377, p. 104.) At the time of its repeal in 1992, section 377 provided in relevant part: "(a) When the death of a person is caused by the wrongful act or neglect of another, his or her heirs ... may maintain an action for damages against the person causing the death. ... [¶] (b) For the purposes of subdivision (a), 'heirs' means only the following: [¶] (1) Those persons who would be entitled to succeed to the property of the decedent according to the provisions of Part 2 (commencing with Section 6400 ) of Division 6 of the Probate Code..." (i.e., the intestacy laws). (Stats. 1983, ch. 842, § 12, *294 pp. 3022-3023, italics added, repealed by Stats. 1992, ch. 178, § 19, p. 890; see Historical and Statutory Notes, 14 West's Ann. Code Civ. Proc., supra, § 377, at p. 104.)
Former section 377 's use of the word "heirs" prompted disputes over whether a decedent's child could sue for wrongful death even if the decedent's entire estate passed to the surviving spouse under community property laws. Courts faced with this question found that the word "heirs," as used in former section 377, "denotes those who are capable of inheriting from the deceased person generally." ( Redfield v. Oakland C. S. Ry. Co . (1895) 110 Cal. 277, 289-290, 42 P. 822 [fact that decedent's sole "heir" was her surviving spouse per community property laws did not preclude her two minor children from recovering in a wrongful death action]; Fiske v. Wilkie (1945) 67 Cal.App.2d 440, 444, 154 P.2d 725 [fact that decedent's husband was alive at the time of her death and did not die until several months later did not bar *881 decedent's daughters from suing for wrongful death].)
In other words, the term " 'heirs' " in former section 377 was "construed in accordance with the laws of succession" as referring to "that narrow class of persons who would have been eligible to succeed to a decedent's estate had he died intestate." ( Steed , supra , 12 Cal.3d at pp. 119, 123, 115 Cal.Rptr. 329, 524 P.2d 801.) Thus, persons with standing under former section 377 included the decedent's " 'issue,' " the decedent's "adopted children," any "illegitimate children from their mother," and nonmarital children "from their father if acknowledged by him." ( Id. at p. 119, 115 Cal.Rptr. 329, 524 P.2d 801 [decedent's stepchild, whom he never formally adopted, could not sue for wrongful death because he had no ability to inherit from decedent under laws of succession].)
Because of these cases, the California Law Revision Commission recommended the Legislature change "heirs" to "children," noting it was unclear whether former section 377 precluded "the decedent's issue ... from joining in the [wrongful death] lawsuit if the decedent leaves a surviving spouse." (Annual Report for 1992, Appendix 5, Tentative Recommendation, Standing To Sue for Wrongful Death , 22 Cal. Law Revision Com. Rep. (1992) p. 959.) The Law Revision Commission explained that the "statute has been broadly construed to permit suit by those who would be intestate takers regardless of the character of the decedent's property, i.e., both the surviving spouse and [the] issue" (citing Fiske v. Wilkie, supra, 67 Cal.App.2d 440, 154 P.2d 725 ) and noted that "[t]he wrongful death statute would be clearer, and would conform to case law, if revised to codify this rule." (Id . at pp. 959-960.)
Following that recommendation, in 1992 the Legislature repealed section 377 and enacted the present wrongful death statute, codified as *295 sections 377.60 to 377.62 of the Code of Civil Procedure. (Stats. 1992, ch. 178, §§ 19-20, pp. 890, 893-894; Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. § 377, p. 104.) The Legislature has further amended section 377.60 since then, although none of those more recent amendments impact this appeal. As currently drafted, section 377.60 grants standing not to the decedent's "heirs " (the language used in former section 377 ), but rather to the decedent's "surviving spouse, domestic partner, children , and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession." (Italics added.)
According to the Law Revision Commission Comments, the change from "heirs" to "children" "makes clear that, even if the decedent's estate is entirely community property, the decedent's children and issue of deceased children are proper parties plaintiff, along with the decedent's surviving spouse. This codifies Fiske v. Wilkie , 67 Cal.App.2d 440, 444, 154 P.2d 725" (Cal. Law Revision Com. com., Deering's Ann. Code Civ. Proc., § 377.60, pp. 164-165.)
As this court previously noted, "[t]he change in the language was not a broadening of the statute, but a mere clarification." ( Phraner v. Cote Mart, Inc. (1997) 55 Cal.App.4th 166, 170, 63 Cal.Rptr.2d 740 ( Phraner ).) The change "was intended to allow the children of a decedent to maintain an action for the wrongful death of a parent even though the parent's entire estate was community property bequeathed to the surviving spouse. Essentially, those children who are not heirs only because the estate consists entirely of community property may now assert a claim." ( Ibid . )
*882 Consequently, notwithstanding the differences between section 377.60 and its predecessor, appellate courts interpreting the current version of section 377.60, subdivision (a), repeatedly have found that "standing to bring a wrongful death action remains linked to the intestacy laws." ( Cheyanna M., supra , 66 Cal.App.4th at p. 865, 78 Cal.Rptr.2d 335.) As such, a plaintiff's "standing to bring a wrongful death action must be determined in accordance with the laws of intestate succession." ( Id. at p. 861, 78 Cal.Rptr.2d 335 ; see Phraner , 55 Cal.App.4th at p. 170, 63 Cal.Rptr.2d 740 [discussing legislative history and observing "the statutory right to bring a wrongful death action under section 377.60, subdivision (a) is grounded in the right to inherit from the decedent"].)
Notably, Cheyanna M. and Phraner were decided over 20 years ago. During that period the Legislature has amended other subdivisions of section 377.60, but declined to revisit subdivision (a), the subdivision at issue here. It therefore " ' "must be presumed that the Legislature [was] aware of the judicial construction [of section 377.60 ] and approve[d] of it." ' " ( People v. Meloney (2003) 30 Cal.4th 1145, 1161, 135 Cal.Rptr.2d 602, 70 P.3d 1023.)
*296 Thus, whether A.S. has standing to sue for Britel's wrongful death turns on whether she has a right to inherit from him. This court previously held in Estate of Britel that A.S. has no right to inherit from Britel under California's intestate succession statutes because Britel never " 'openly held out [A.S.] as his own' " within the meaning of Probate Code section 6453, subdivision (b)(2). ( Estate of Britel, supra, 236 Cal.App.4th at pp. 135-140, 186 Cal.Rptr.3d 321.) Jackie does not challenge that holding here or otherwise argue A.S. has a right to inherit from Britel under other statutory grounds.
Because A.S. has no right to inherit from Britel under California's intestacy statutes, it follows that she does not have standing under section 377.60 to pursue a wrongful death action for his death. Simply put, the fact that Britel is her biological father, without more, is not enough to create wrongful death standing. (See Phraner , supra , 55 Cal.App.4th at pp. 168-171, 63 Cal.Rptr.2d 740.) Thus, A.S., " ' "like any number of other persons who, in particular cases, may suffer ... personal loss by the death of an individual, is without legal recourse absent specific statutory remedy." ' " ( Id. at p. 170, 63 Cal.Rptr.2d 740.)
Of course, that is not to say that nonmarital children with absentee fathers never have standing to sue for a parent's wrongful death. Quite the contrary. A nonmarital child can establish he or she is entitled to take from the decedent under California's intestate succession laws - and thus establish standing to sue for his or her biological father's wrongful death - in a number of different ways: (1) by showing the father openly held out the child as his own ( § 377.60, subd. (a) ; Prob. Code, § 6453, subd. (b)(2) ); (2) by showing it was impossible for the father to hold out the child as his own during his lifetime (e.g., if the father died before the child was born) and establishing paternity by clear and convincing evidence ( § 377.60, subd. (a) ; Prob. Code, § 6453, subd. (b)(3) ; Cheyanna M., supra , 66 Cal.App.4th at p. 877, 78 Cal.Rptr.2d 335 ); (3) by showing the child resided with the father for at least 180 days immediately before his death and was dependent on the father for at least half of his or her support ( § 377.60, subd. (c) ); or (4) by producing a court order entered during the father's lifetime declaring paternity ( § 377.60, subd. (a) ; Prob. Code, § 6453, subd. (b)(1) ).
*883 Our holding would be different if Jackie had obtained a court order declaring paternity during Britel's lifetime. But Jackie knowingly elected not to obtain a paternity declaration in the 10 years after A.S. was born. Had Jackie done so, A.S. certainly would have standing to sue for Britel's wrongful death. ( § 377.60, subd. (a) ; Prob. Code, § 6453, subd. (b)(1).) A.S. also would have standing if Britel had died before A.S. was born, and if A.S. established paternity by clear and convincing evidence. ( Prob. Code, § 6453, subd. (b)(3).) And she would have standing if Britel had held A.S. out as his own. ( Prob. Code, § 6453, subd. (b)(2).) None of those statutory prerequisites *297 occurred here, however. Jackie's decision not to pursue a paternity declaration "carried the risk that [Britel] could die ... while she waited for him to grow into fatherhood." ( Estate of Britel , supra , 236 Cal.App.4th at p. 144, 186 Cal.Rptr.3d 321.)[5]
"The decision of the legislature as to how far it will extend the right to maintain a wrongful death action is conclusive." ( Marks v. Lyerla (1991) 1 Cal.App.4th 556, 561, 2 Cal.Rptr.2d 63.) Our Supreme Court has declared, "the limitation on those who may bring the action is one which is imposed by the Legislature and, absent a constitutional basis for departure from a clear expression of legislative intent, we are bound thereby." ( Steed, supra, 12 Cal.3d at p. 120, 115 Cal.Rptr. 329, 524 P.2d 801.) "This is not to say that in all instances persons who are not in the class may not suffer equal or greater losses than some who are within the class, but the Legislature is not compelled to anticipate and provide for such persons." ( Id. at p. 124, 115 Cal.Rptr. 329, 524 P.2d 801.)
There is a good reason for this. In crafting standing rules for wrongful death actions, the Legislature can engage committees to review proposed legislation, hold hearings to investigate the policy implications of the contemplated legislation, hear from interested parties, debate various proposals, forge compromises, and entertain recommendations from the Law Revision Commission. We can do none of this. Adopting Jackie's position would unravel that democratic process, especially where, as here, the Legislature has implicitly declined to adopt the position now urged upon us by appellant. "In the exercise of a judicial function, we should not assume the prerogative of making changes in a statute when the Legislature, by strong implication, has elected not to do so." ( Steed, supra, 12 Cal.3d at p. 121, 115 Cal.Rptr. 329, 524 P.2d 801.)
Jackie argues A.S. should have standing because she lost the potential for enjoying Britel's companionship and support in the future. This is a policy argument that the Legislature presumably has weighed and rejected. The argument furnishes no basis for standing because it is based on mere speculation. (See Corder v. Corder (2007) 41 Cal.4th 644, 661, 61 Cal.Rptr.3d 660, 161 P.3d 172 [damages available for wrongful death include " ' "the financial benefits the heirs were receiving at the time of death [and] those reasonably to be *884 expected in the future" ' "] (italics added).) The mere possibility A.S. might have one day qualified as Britel's "heir" had she *298 sought a paternity decree or had Britel decided to hold her out as his own is not enough to confer wrongful death standing. (See Garcia v. Douglas Aircraft Co . (1982) 133 Cal.App.3d 890, 893, 184 Cal.Rptr. 390 [decedent's fiancée, who was engaged to marry decedent eight days after his death and who had cohabited with him, lacked standing to bring wrongful death action].)
4. A Contrary Holding Would Wreak Havoc on the Legislative Scheme
Adopting Jackie's argument that A.S. is entitled to standing based solely on a purely biological tie to the decedent would wreak havoc on the carefully crafted scheme the Legislature has adopted. The Legislature limited wrongful death standing to the persons entitled to take from the decedent under California's intestate succession laws. Those persons, "as a class, stand in the closest relationship to a deceased" and often "suffer the greatest loss upon [the deceased's] wrongful death." (See Steed, supra , 12 Cal.3d at p. 124, 115 Cal.Rptr. 329, 524 P.2d 801.) Biological children who had no relationship whatsoever with the decedent during his lifetime do not fall within that class.
Under Jackie's interpretation of the statute, a decedent's biological child would have standing even if a court had terminated the decedent's parental rights or even if the child had been adopted by another. That would directly conflict with existing precedent from this court. (See Phraner, supra , 55 Cal.App.4th at pp. 168-171, 63 Cal.Rptr.2d 740 [adopted child had no standing to sue for death of her biological mother, notwithstanding genetic relationship, because adoption legally severed the parent-child relationship for intestate succession].)
Granting A.S. standing also would be patently unfair because it would categorically deprive Britel's mother and siblings of standing to sue for his wrongful death. Section 377.60 confers standing to "[t]he decedent's surviving spouse, domestic partner, children, and issue of deceased children, or , if there is no surviving issue of the decedent , the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession." (Italics added.) Thus, a decedent's parents and siblings do not have standing to sue for wrongful death unless the decedent leaves behind no "children." ( Ibid. ; see Chavez v. Carpenter (2001) 91 Cal.App.4th 1433, 1440, 111 Cal.Rptr.2d 534 ["where a decedent leaves issue, 'his parents would not be his heirs at all [citations] and therefore [are] not entitled to maintain this [wrongful death] action at all' "]; see also Scott, supra , 184 Cal.App.4th at p. 1511, 109 Cal.Rptr.3d 846 [wrongful death " ' "standing" among multiple claimants is determined by statutory rank' "].) We cannot imagine the Legislature intended that A.S. - who had no relationship whatsoever with Britel - would have standing to sue for his wrongful death to the exclusion of Britel's other family members, with whom he did have a relationship. Yet that *299 is precisely the result Jackie requested in the trial court, where she claimed A.S. " 'outrank[ed] ' " Britel's other family members and was "the only person permitted under California law to pursue wrongful death claims." (Italics added.)[6] *885 The dissent suggests granting standing to A.S. would be of minimal consequence because she still "would ultimately have to prove damages." (Dis. opn., post , at p. 5.) But granting standing to A.S. also would cut off the ability of Britel's mother and siblings to sue for his wrongful death. The notion that a person who almost certainly suffered no cognizable damages from the decedent's death could, simply by filing suit, prevent persons who likely did suffer such damages from ever having their day in court, is wholly incongruous and contrary to the legislative purpose of section 377.60.
In closing, "the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare' " ( Justus , supra , 19 Cal.3d at p. 575, 139 Cal.Rptr. 97, 565 P.2d 122 ), and we must interpret a statute in a manner that " 'effectuate[s] [its] purpose.' " ( Union Bank of California v. Superior Court (2004) 115 Cal.App.4th 484, 488, 9 Cal.Rptr.3d 137.) The logical extension of Jackie's argument in favor of standing - that a purely biological tie to the decedent, without more, is enough - would frustrate the Legislature's decision to limit standing to persons entitled to take from the decedent under California's intestate succession laws, and would "expand the category of people able to recover for the loss beyond that which was contemplated by the Legislature in drafting the statute. We decline to do so." ( Phraner , supra, 55 Cal.App.4th at p. 170, 63 Cal.Rptr.2d 740.)
C. Jackie's Equal Protection Challenges Fail
Jackie next argues that the wrongful death standing statute, as interpreted here, violates the equal protection clauses of the state and federal Constitutions by discriminating on the basis of illegitimacy and gender. We disagree.
" 'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, " '[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in *300 an unequal manner.' " [Citation.] "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " [Citation.]' " ( People v. Valencia (2017) 3 Cal.5th 347, 376, 220 Cal.Rptr.3d 230, 397 P.3d 936 ( Valencia ).)
As to this first step, we conclude the standing rules do not distinguish between marital and nonmarital children; at most they draw a distinction between nonmarital children whose parents took the steps necessary to establish a parent-child relationship during the father's lifetime and children whose parents did not. The creation of a parent-child relationship makes it likely the child suffered emotional or financial harm from the decedent's death. Providing standing where no parent-child relationship exists would frustrate the statutory purpose of compensating those most likely to have suffered harm. These two categories of persons therefore are not similarly situated when considering the purpose of the wrongful death standing rules.
"The second step [of the equal protection analysis] is determining whether there is a sufficient justification for the unequal treatment. The level of justification *886 needed is based on the right implicated." ( People v. Flint (2018) 22 Cal.App.5th 983, 990, 231 Cal.Rptr.3d 910.) Intermediate scrutiny applies to discriminatory classifications based on illegitimacy and gender. ( Clark v. Jeter (1988) 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 ( Clark ); Estate of Britel , supra , 236 Cal.App.4th at p. 145, 186 Cal.Rptr.3d 321 [explaining why strict scrutiny does not apply to illegitimacy classifications].) " 'To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective.' " ( Estate of Britel, supra , 236 Cal.App.4th at p. 145, 186 Cal.Rptr.3d 321.) Here, that objective is limiting wrongful death standing to those persons most likely to have had a relationship with the decedent.
1. Illegitimacy
a. The Wrongful Death Standing Rules Do Not Exclude Nonmarital Children
California's wrongful death standing rules do not categorically exclude nonmarital children. They confer standing on a variety of children - both marital and nonmarital - if certain criteria pertaining to their relationship with the decedent are met. Specifically, wrongful death standing exists if: a natural parent-child relationship (and thus heirship status) can be established ( § 377.60, subd. (a) ; Prob. Code, § 6453 ); a real or putative stepparent-stepchild relationship plus financial dependence can be established ( § 377.60, subd. (b) ); or a longstanding, financially dependent relationship can be established ( § 377.60, subd. (c) ).
*301 As for the first option, a natural parent-child relationship can be established under the Probate Code "regardless of the parents' marital status. [Citation.] That is, the distinction between legitimate and illegitimate children has been eliminated." ( Lozano v. Scalier (1996) 51 Cal.App.4th 843, 846, 59 Cal.Rptr.2d 346 ( Lozano ); see Prob. Code, § 6450, subd. (a) ["The relationship of parent and child exists between a person and the person's natural parents, regardless of the marital status of the natural parents"].) As already noted, Probate Code section 6453 provides a variety of methods to establish a natural parent-child relationship, none of which hinges exclusively on the parents' marital status. For example, if the decedent openly held out the child as his own, that alone would be sufficient to create standing. ( Prob. Code, § 6453, subd. (b)(2).)
To be sure, if this case involved a "classification[ ] that burden[ed] illegitimate children for the sake of punishing the illicit relations of their parents," we would reach a different result "because 'visiting this condemnation on the head of an infant is illogical and unjust.' " ( Clark, supra , 486 U.S. at p. 461, 108 S.Ct. 1910.) But this is not such a case. As explained above, a nonmarital child has multiple ways of establishing heirship, and thus wrongful death standing. "There is in California no 'insurmountable barrier' to the right of a legitimate or an illegitimate child to succeed to the estate of its natural parent [or] to bring an action for the wrongful death of such parent." ( Steed, supra , 12 Cal.3d at p. 125, 115 Cal.Rptr. 329, 524 P.2d 801.)
In support of her equal protection challenge, Jackie relies on United States Supreme Court decisions mandating equal legal treatment of marital and nonmarital children in a broad range of substantive areas. However, these cases involved laws that denied rights to a dependent child based solely on his or her parents' marital status, and are thus inapposite. (See Gomez v. Perez (1973) 409 U.S. 535, 538, 93 S.Ct. 872, 35 L.Ed.2d 56 [Texas law that allowed only marital children to obtain financial *887 support from fathers was "invidious" discrimination]; Weber v. Aetna Casualty & Surety Co. (1972) 406 U.S. 164, 165, 170, 92 S.Ct. 1400, 31 L.Ed.2d 768 [Louisiana could not treat employee's dependent unacknowledged nonmarital children differently than his marital children or acknowledged nonmarital children for workers' compensation benefits]; Levy v. Louisiana (1968) 391 U.S. 68, 72, 88 S.Ct. 1509, 20 L.Ed.2d 436 [Louisiana could not prevent dependent children from suing for their mother's wrongful death merely because they were born out of wedlock; children were dependent on mother and "in her death ... suffered wrong in the sense that any dependent would"]; see also Arizmendi v. System Leasing Corp. (1971) 15 Cal.App.3d 730, 737, 93 Cal.Rptr. 411 ( Arizmendi )[7] [children *302 cannot be prohibited from suing for biological father's wrongful death solely on the basis they are nonmarital].)
Unlike those cases, the existing statutory framework does not create an insurmountable barrier to nonmarital children based on their parents' marital status, nor does it deprive nonmarital children of a fundamental right, as Jackie suggests. At most, it draws a distinction between nonmarital children whose parents took the steps necessary to establish a parent-child relationship during the father's lifetime and children whose parents did not. That is not a suspect classification, particularly when viewed in the context of the purpose of the wrongful death standing rules. (See Valencia , supra, 3 Cal.5th at p. 376, 220 Cal.Rptr.3d 230, 397 P.3d 936.)
b. The Wrongful Death Standing Rules Are Substantially Related to Important Governmental Objectives
Even if this case involved a suspect classification (which it does not), the statutory framework at issue is substantially related to the statute's ultimate purpose: conferring wrongful death standing on specified persons whom our Legislature deems most likely to have suffered damages from the loss of the decedent's companionship or financial support. (See Lattimore, supra, 239 Cal.App.4th at p. 968, 191 Cal.Rptr.3d 766 ["purpose is to compensate specified persons - heirs - for the loss of companionship and for other losses suffered as a result of a decedent's death"]; Quiroz v. Seventh Ave. Center (2006) 140 Cal.App.4th 1256, 1263, 45 Cal.Rptr.3d 222 [statute " 'limits the right of recovery to a class of persons who, because of their relation to the deceased, are presumed to be injured by his [or her] death' "]; see also Steed, supra , 12 Cal.3d at p. 124, 115 Cal.Rptr. 329, 524 P.2d 801 ["the class of those who suffer the greatest loss upon a wrongful death are the heirs of the deceased"].) Wrongful death standing bears a close tie to the presumed existence of some sort of supportive relationship with the decedent - emotional or financial - during his lifetime, and the statute aims to compensate those persons for the loss of support. The fact that a different subdivision of the wrongful death statute, *888 subdivision (c), confers wrongful death standing on any minor who (a) resided with the decedent in his household for 180 days before his death and (b) was dependent on the decedent for at least one-half of his or her support, illustrates this point. ( § 377.60, subd. (c).) *303 Requiring the existence or establishment of a parent-child relationship during the decedent's lifetime is consistent with that statutory purpose. Unlike marital or nonmarital children who were dependent on or had some sort of relationship with their father, nonmarital children who never knew and were never supported by their absentee father - whose sole tie to their father was genetic - are unlikely to suffer any compensable loss of companionship or financial support in the event of his death. They are thus precluded from suing unless they obtained a court order of paternity during the father's lifetime. ( Prob. Code, § 6453, subd. (b)(1).)
As one court observed, "[t]he state has a legitimate interest in preferring" "a man who has undertaken the obligations of marriage and family [over] a man whose only connection with the child is biological." ( Rodney F. v. Karen M. (1998) 61 Cal.App.4th 233, 239, 71 Cal.Rptr.2d 399 [holding statutory presumption of husband's paternity does not violate biological father's equal protection rights].) So, too, does the state have a legitimate interest in limiting wrongful death standing to marital and nonmarital children who likely had a relationship with their father.
Apparently taking issue with the statutory requirement that Jackie obtain a paternity order "during the parent's lifetime" ( Prob. Code, § 6453, subd. (b)(1), italics added), Jackie suggests our holding unfairly penalizes A.S. for her mother's inaction. But our laws routinely put the onus on the parent or guardian to assert rights for or otherwise act on behalf of a minor child in a variety of contexts, and "there is a presumption that fit parents act in the best interests of their children." ( Troxel v. Granville (2000) 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49.) Here, Jackie knowingly decided not to pursue a paternity declaration, despite having 10 years to do so before Britel died, and she acknowledged her decision not to try to force Britel to accept parentage meant losing financial support for her child. We must assume she acted in A.S.'s best interests.
Further, the statutory requirement that the paternity order be "entered during the [parent's] lifetime" has survived earlier equal protection challenges. ( Estate of Sanders (1992) 2 Cal.App.4th 462, 475-477, 3 Cal.Rptr.2d 536, italics added ( Sanders ) [court was "fully cognizant" of former Probate Code § 6408, subd. (c)(2) 's "harsh effect on children born out of wedlock," but nevertheless found no equal protection violation].) In upholding the statute's constitutionality, the Sanders court relied largely on Lalli v. Lalli (1978) 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 ( Lalli ).
Lalli involved a constitutional challenge to a New York statute that allowed a nonmarital child to inherit from an intestate father only if a court had issued a paternity decree during the father's lifetime. ( *304 Lalli, supra, 439 U.S. at pp. 261-262, 99 S.Ct. 518.) A divided Supreme Court held the statute was "substantially related to the important state interests the statute is intended to promote" and therefore found no violation of the equal protection clause. ( Id. at pp. 275-276, 99 S.Ct. 518 (plur. opn. of Powell, J.).) Justice Powell's plurality opinion observed that the statute was intended "to ensure the accurate resolution of claims of paternity ... [,] to minimize the potential for disruption of estate administration," and to permit a man to defend his reputation against unjust *889 paternity claims. ( Id. at p. 271, 99 S.Ct. 518.) The plurality held the statute did not violate equal protection because it bore a substantial relationship to those purposes: "The administration of an estate will be facilitated, and the possibility of delay and uncertainty minimized, where the entitlement of an illegitimate child to notice and participation is a matter of judicial record before the administration commences." ( Ibid . )
Although Lalli dealt with intestate succession laws, the analytical framework for evaluating equal protection violations applies here with equal force. Lalli observed "few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results." ( Lalli , supra , 439 U.S. at p. 273, 99 S.Ct. 518.) But the Court explained, "[o]ur inquiry under the Equal Protection Clause does not focus on the abstract 'fairness' of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment." ( Ibid . )
Here, the requirement that a paternity order be entered during the decedent's lifetime is substantially related to the important governmental objective of limiting wrongful death standing to those persons most likely to have had a supportive relationship with the decedent. In its most basic sense, wrongful death standing for a nonmarital child hinges on establishing that he or she had some sort of supportive relationship (emotional or financial) with his or her biological father during his lifetime , or alternatively obtained a paternity decree during his lifetime . " 'A paternity decree, while not necessarily ordering support, would almost as strongly suggest support was subsequently obtained' " ( Mathews v. Lucas (1976) 427 U.S. 495, 514, 96 S.Ct. 2755, 49 L.Ed.2d 651 ( Mathews ) ) and thus supports an inference that a relationship was formed during the father's lifetime.
In short, even if the wrongful death standing rules created classifications based on illegitimacy (which they do not), we would find no equal protection violation. The statute's limitations on wrongful death standing are substantially related to the important governmental objective of limiting recovery to those individuals most likely to have suffered losses from the decedent's death. (See Steed, supra , 12 Cal.3d at p. 124, 115 Cal.Rptr. 329, 524 P.2d 801 [concluding former section 377 was "reasonably drawn to limit recovery to those intestate heirs who suffer loss by *305 the fact of a wrongful death"]; see also Mathews, supra, 427 U.S. at p. 513, 96 S.Ct. 2755 [classifications conditioning eligibility of certain nonmarital children for a surviving child's insurance benefits upon a showing of paternity and support are permissible because they are reasonably related to the likelihood of dependency at death].)
2. Gender
Jackie alternatively argues that section 377.60, as interpreted here, discriminates on the basis of gender in that it creates more hurdles for a nonmarital child suing for the wrongful death of a father than for the wrongful death of a mother. While an unmarried birth mother typically qualifies as the child's natural parent at birth, an unmarried father does not necessarily qualify as the child's natural parent unless additional circumstances are present, such as a declaration of paternity or evidence the father openly held out the child as his own. Jackie concludes the different requirements for becoming a natural parent violate equal protection.[8] To *890 prevail, Jackie must show mothers and fathers are similarly situated in establishing the requisite relationship that nonmarital children must show for standing. This she cannot do.
It is not impermissibly discriminatory to have different requirements for establishing natural parent status for birth mothers and biological fathers because mothers and fathers are not similarly situated when it comes to their role in becoming parents. The mother carries the baby to term and gives birth; the father does not. Only a mother's parental relationship is established at birth. As such, "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood. The imposition of a different set of rules for making that legal determination with respect to mothers and fathers is neither surprising nor troublesome from a constitutional perspective." ( Nguyen v. INS (2001) 533 U.S. 53, 63, 121 S.Ct. 2053, 150 L.Ed.2d 115 ; see Sessions v. Morales-Santana (2017) --- U.S. ----, 137 S.Ct. 1678, 1694, 198 L.Ed.2d 150 ["imposing a paternal-acknowledgment requirement on fathers [is] a justifiable, easily met means of ensuring the existence of a biological parent-child relationship, which the mother establishes by giving birth"]; Lehr v. Robertson (1983) 463 U.S. 248, 267-268, 103 S.Ct. 2985, 77 L.Ed.2d 614 ["If one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two parents different legal rights"].)
*306 In sum, we find no merit to Jackie's equal protection challenges. The equal protection " 'doctrine is not intended "to make it necessary that the legislature, when conferring new rights of action upon particular classes of citizens for injuries not previously actionable, should by the same act declare that all persons who may suffer damages from injuries of that character shall also have such right of action." ' " ( Phraner, supra , 55 Cal.App.4th at p. 170, 63 Cal.Rptr.2d 740.)
III.
DISPOSITION
The judgment is affirmed. The Millers shall recover their costs on appeal. ( Cal. Rules of Court, rule 8.278(a)(1).)
I CONCUR:
BEDSWORTH, ACTING P. J.

Prior opinions have used the term "illegitimate children." We use the term "nonmarital children" instead because we do not wish to suggest that children born to unmarried parents are in any way inferior to children born to married parents. This opinion uses the term "nonmarital children" in the same sense that prior opinions have used the term "illegitimate children."

We provided a more detailed discussion of the facts in Estate of Britel (2015) 236 Cal.App.4th 127, 186 Cal.Rptr.3d 321 (Estate of Britel ). We will not restate them in full here, but instead provide only a brief summary for context.

Section 377.60 also confers standing on various other individuals, but those provisions are not at issue here.

Citing a dictionary definition, our dissenting colleague interprets the word "children" under the wrongful death statute to mean the biological son or daughter of human parents. (Dis. opn., post , at p. 894.) Courts must exercise "great caution" when relying on a dictionary definition of a common term to determine statutory meaning because a dictionary " 'is a museum of words, an historical catalog rather than a means to decode the work of legislatures.' " (United States v. Costello (7th Cir. 2012) 666 F.3d 1040, 1043.) " '[I]t makes no sense to declare a unitary meaning that "the dictionary" assigns to a term. There are a wide variety of dictionaries from which to choose, and all of them usually provide several entries for each word.' " (Id. at p. 1044.) Indeed, Black's Law Dictionary (7th Ed.) includes four different definitions of "child" and over a dozen subentries for related terms, such as "natural child," "foster child," and "nonmarital child." Courts should not simply pick the particular dictionary definition yielding the desired result when interpreting a statute.
The dissent purports to give the statute a "commonsense" reading (dis. opn., post , at p. 890.), but ignores the context and purpose of the wrongful death statute as a whole. "The idea that semantically unambiguous sentences-sentences clear 'on their face'-sentences whose meaning is 'plain'-can be interpreted without reference to purpose inferred from context is fallacious. Take that clearest of directives: 'Keep off the grass.' Read literally it forbids the groundskeeper to mow the grass. No one would read it literally." (Marozsan v. United States (7th Cir. 1988) 852 F.2d 1469, 1482 (conc. opn. of Posner, J.).)

We are sympathetic to A.S.'s plight. Nevertheless, we must leave to the Legislature the question of whether to expand the relatively short list of persons who have wrongful death standing to include the nonmarital biological child of an absentee father who never openly held her out as his own and against whom the child never obtained a declaration of paternity. To be sure, advances in science require continual adjustments in and reconsiderations of legal standards, and DNA testing has necessitated many re-evaluations and amendments to the law. That said, we are convinced our opinion represents the current state of the law, and we believe the complexity of any adaptation makes it more amenable to the legislative process than the judicial one.

To further illustrate the unforeseen and presumably unintended consequences of this interpretation, suppose the biological child of an absentee father had her own child and then died. Under Jackie's reading of the statute, that child - the absentee father's grandchild - would have standing to sue for his wrongful death to the exclusion of the decedent's parents and siblings, despite having nothing more than a genetic tie to the decedent. That cannot possibly be what the Legislature intended.

At the time Arizmendi was decided, former Probate Code section 255 prevented nonmarital children from inheriting from their father unless they were either legitimated (by subsequent marriage of their parents or by reception into their father's home) (former Civ. Code, §§ 215, 230 ) or acknowledged "in writing, signed in the presence of a competent witness." In 1975, as part of a major overhaul recommended by the Law Revision Commission, former section 255 was repealed, and the Uniform Parentage Act was adopted, abolishing the distinction between marital and nonmarital children. (Lozano, supra , 51 Cal.App.4th at p. 847, 59 Cal.Rptr.2d 346.) Under this new scheme, even if paternity is not presumed, a nonmarital child with an absentee father may nevertheless establish heirship status by obtaining a judicial decree of paternity, as noted above. (Ibid. )

The logical extension of Jackie's argument is that the various statutes governing how a nonbirth mother establishes natural parent status are also unconstitutional. (See, e.g., Prob. Code, § 6453 ; Fam. Code, §§ 7611, 7630.)