Filed 7/30/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICHARD PAUL RUTGARD,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>CITY OF LOS ANGELES,<br><br>      Defendant and Appellant. | B297655<br><br>(Los Angeles County<br>Super. Ct. No. BS170286) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Scott Marcus, Chief, Civil Litigation Branch, Blithe S. Bock, Assistant City Attorney, Michael M. Walsh, Deputy City Attorney, for Defendant and Appellant.

Sullivan, Workman & Dee, Karyn A. M. Jakubowski, and Charles D. Cummings, for Plaintiff and Respondent.

* * * * * *

California's Eminent Domain Law (Code Civ. Proc., § 1230.010 *et seq.*)[1] —and, in particular, Code of Civil Procedure section 1245.245—provides that when "[p]roperty acquired by a public entity [through eminent domain] . . . is not used for [its intended] public use . . . within 10 years of adoption of the resolution of necessity [that authorized its taking]," the entity must allow the property's original owner an opportunity to buy it back "unless the [entity's] governing body adopts" a new "resolution" "reauthorizing the existing stated public use." (§ 1245.245, subds. (b), (f).)  In this case, the City of Los Angeles adopted an initial resolution in 2007 and a reauthorization resolution in 2017.

This appeal presents four cascading questions:

First, does a public entity desiring to retain condemned property under section 1245.245 have to "adopt" its initial and reauthorization resolutions within 10 years of each other?  We hold the answer is "yes."

Second, and if there is such a 10-year deadline, which definition of "adoption" does section 1245.245 use—the date when the resolutions are *initially* adopted, are *finally* adopted, or become effective?  We hold that section 1245.245 uses the date of "final adoption."

Third, which law governs the inquiry into whether a resolution has been finally adopted—the local law governing the public entity at issue, or a standardized definition imposed by section 1245.245?  We hold that local law fixes when a resolution is "finally adopted."

---

[1]     All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Lastly, when are resolutions finally adopted under the local law applicable here—namely, the city's charter? We hold that a resolution is "finally adopted" once the city council has enacted the resolution and it has either been (1) approved by the mayor, or (2) vetoed by the mayor, but overridden by the city council.

Because the city in this case finally adopted its initial and reauthorization resolutions 19 days past the 10-year deadline, section 1245.245 requires the city to offer to sell the property back to its original owner. The trial court's writ so ordering is accordingly affirmed.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Property at issue*

This case concerns a two-story building with 8,300 square feet of commercial space (the Property). The Property is located on Figueroa Street in the Highland Park neighborhood of the City of Los Angeles (the City), and is registered as a City Historical Monument. In early 2007, the Property was owned by Richard Paul Rutgard (Rutgard).

#### B. *2007 Ordinance*

On May 29, 2007, the Los Angeles City Council (the City Council) enacted an ordinance "authorizing the condemnation" of the Property (the 2007 Ordinance). The 2007 Ordinance constituted a Resolution of Necessity declaring that the Property was being "acquired for public purposes"—namely, to serve as a "constituent service center" for City residents. The 2007 Ordinance passed by a two-thirds majority of the City Council.

On June 8, 2007, the Mayor of the City of Los Angeles (the Mayor) "approved" the 2007 Ordinance.

3

The City calculated the effective date of the 2017 Ordinance to be July 24, 2007. An ordinance presumptively becomes effective "31 days from its publication" (L.A. City Charter, vol. I, art. II, § 252), and an ordinance is deemed "published" if it is "posted . . . for at least ten days in three public places" (L.A. Admin. Code, § 2.13). The 2017 Ordinance was posted on June 14, 2007.

**C.     *The interregnum period***

On October 16, 2007, the City filed an eminent domain lawsuit to condemn the Property. In November 2009, the City and Rutgard settled the lawsuit and the City agreed to pay $2.5 million for the Property.

Due to the "economic downturn in 2008," the City never developed the Property into a constituent center.

**D.     *2017 Ordinance***

On June 23, 2017, the City Council enacted an ordinance "reauthoriz[ing]" the "use of the Property for a constituent service center" (the 2017 Ordinance). The 2017 Ordinance passed by a two-thirds majority of the City Council.

On June 27, 2017, the Mayor "approved" the 2017 Ordinance.

The City calculated two different effective dates for the 2017 Ordinance. The City initially calculated the effective date to be August 7, 2017, based on a posting date of June 28, 2017, which would constitute publication 10 days later and would become effective 31 days after that. The very next day, however, the City re-calculated the effective date to be July 9, 2017, based (1) on a posting date of June 29, 2017, which would constitute publication 10 days later, and (2) on a finding that the ordinance should take "effect[] upon publication" under section 252 of the

4

city charter (thus bypassing the presumptive, 31-day waiting period).

## II.    Procedural Background

On July 24, 2017, Rutgard filed a verified petition for a writ of mandate alleging that the City had a "present legal duty" to "offer [him] a right of first refusal to purchase" the Property under section 1245.245 because its reauthorization of the 2007 taking was untimely.[2]  After the City filed an answer, after briefing on the merits, and after a hearing, the trial court issued a seven-page ruling granting Rutgard's petition.

The trial court ruled that the City had a "clear, present, ministerial duty to offer [Rutgard] the right of first refusal to purchase the Property" under section 1245.245 because the 2017 Ordinance was not timely under that section.  The court reasoned that the City "adopted its initial resolution of necessity on May 29, 2007," which was the day the City Council initially adopted the resolution; that the City had "failed to use the Property as a constituent service center"; and that all of the City's acts to pass a reauthorization resolution occurred in June 2017, which was more than 10 years after May 29, 2007.  The court rejected the City's argument that section 1245.245's 10-year clock should not begin to run until the date the 2007 Ordinance became effective (that is, on July 24, 2007) because, in the court's view, "[the] language [of section 1245.245] could not be clearer:  The 10-year

---

[2]    Rutgard also alleged a claim for declaratory relief, but voluntarily dismissed that claim after the trial court granted his writ petition.

Although Rutgard's petition sought relief against the City and the City Council, the City responded that the City Council is "not a separate legal entity from the City" and the trial court ultimately entered judgment against the City alone.

clock begins running on the date of *adoption*, not . . . the effective date of the ordinance." The court further found that section 1245.245's legislative history was consistent with its text: Both set the deadline for a new, reauthorization resolution as "within 10 years of the *adoption* of the [original] resolution of necessity" (italics added).[3]

Following the entry of judgment and the issuance of a writ of mandate, the City filed this timely appeal.

## DISCUSSION

The City argues that the trial court erred in granting Rutgard's writ of mandate. A court may issue a writ of mandate only if the petitioner establishes (1) ""a clear, present . . . ministerial duty on the part of the respondent'" [citations]"; (2) "a correlative "'clear, present and beneficial right in the petitioner to the performance of that duty'" [citations]"; and (3) "no 'plain, speedy, and adequate' alternative remedy exists [citation]." (*People v. Picklesimer* (2010) 48 Cal.4th 330, 340 (*Picklesimer*); *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 490-491 (*Younger*); see generally §§ 1085, 1086.) "A ministerial duty is an obligation to perform a specific act in a manner prescribed by law whenever a given state of facts exists, without regard to any personal judgment as to the propriety of the act." (*Picklesimer*, at p. 340.) A court may issue a writ of mandate against a local entity such as a city (*Younger*, at p. 491 ["[t]he writ will issue against a . . . city"]), and may do so when a public entity fails to perform acts prescribed by our

_____

[3] The court also rejected the City's argument that the 10-year clock should not begin to run until the date the Property was *acquired* by a public entity. The City does not press that argument in this appeal.

6

state's Eminent Domain Law (e.g., *Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1114). In reviewing the trial court's issuance of a writ of mandate in this case, we are reviewing its interpretation of the Eminent Domain Law and its application of that law to undisputed facts. Our review of each is de novo (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183; *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032), and we are accordingly not bound by either the trial court's ruling or its rationale (see *Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1361).

Under our state's Constitution, a public entity's eminent domain power authorizes the condemnation of private property only if "the public interest and necessity" so "require" and the property's owner is "just[ly] compensat[ed]" for the taking. (Cal. Const., art I, § 19; see also U.S. Const., 5th Amend; §§ 1240.010, 1240.030.) To exercise this power, the public entity must at the outset "adopt[] a resolution of necessity" specifying, among other things, "the public use for which the property is to be taken." (§§ 1240.040, 1245.230.)

To ensure that public entities do not use their eminent domain power to acquire a property and then hold or "bank[]" that property indefinitely without ever putting it to its intended public use, our Legislature in 2006 enacted section 1245.245. In pertinent part, subdivision (b) provides:

> "Property acquired by a public entity . . . that is
> . . . not used for the public use stated in the [original]
> resolution of necessity within 10 years of the adoption
> of th[at] resolution . . . shall be sold in accordance
> with the terms of subdivision[] (f). . ., unless the

7

governing body adopts a resolution . . . reauthorizing the existing stated public use of the property by a vote of at least two-thirds of all members of the governing body of the public entity or a greater vote as required by statute, charter, or ordinance."

(§ 1245.245, subd. (b)). Subdivision (f), in turn, provides in pertinent part:

"If the public entity fails to adopt . . . a reauthorization resolution . . ., and that property was not used for the public use stated in [the property's original] resolution of necessity . . . between the time of its acquisition and the time of the public entity's failure to adopt a [reauthorization] resolution . . ., the public entity shall offer the person or persons from whom the property was acquired the right of first refusal to purchase the property . . . [a]t the present market value."

(§ 1245.245, subd. (f).)

On appeal, the City argues that it complied with section 1245.245's mandate—and that the trial court erred in granting a writ premised on the City's noncompliance—because (1) section 1245.245 imposes no time limit whatsoever on the public entity's adoption of a reauthorization resolution (because, in the City's view, the statute's 10-year deadline sets the time period during which the public entity must fail to put the property to public use and *not* the time period for enacting a reauthorization resolution),[4] and (2) even if section 1245.245 requires a public

---

4      Although the City raises this argument for the first time on appeal, it turns entirely on a question of law (namely, statutory

8

entity to adopt a reauthorization resolution within 10 years of adopting the original resolution, a resolution is "adopted" on the date it becomes effective, and here the effective dates of the 2007 Ordinance and 2017 Ordinance are less than 10 years apart.[5]

The City's two main arguments ultimately break down into—and hence present—four questions: (1) Does section 1245.245 obligate a public entity to "adopt" a reauthorization resolution within 10 years of adopting its original resolution?, (2) If so, how does section 1245.245 define when a resolution is "adopted"?, (3) Does section 1245.245 incorporate its own definition of initial adoption, final adoption or effective date, or does it instead look to local law to define those terms?, and (4) How does the local law governing the City's adoption of resolutions define the relevant term?

---

interpretation) that we may, and in this case do, choose to entertain.  (*People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3.)

[5]     The City raises a third argument, but it is frivolous.  The City asserts that this case is inappropriate for a writ of mandate because the adoption of a resolution of necessity is a discretionary, quasi-legislative act and thus one that the City has no ministerial duty to undertake, thereby negating one of the key requirements for writ relief.  (*Picklesimer, supra*, 48 Cal.4th at p. 340; *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 ["quasi-legislative decisions" are reviewed solely for arbitrariness].)  This assertion is frivolous because Rutgard is not attacking the City's discretionary decision whether to adopt the reauthorization resolution, but is instead seeking to enforce section 1245.245's duty to make him a buy-back offer, a duty that is *mandated by statute* once the statute's 10-year deadline is blown.  (§ 1245.245, subds. (b) & (f).)

**I. Does Section 1245.245's 10-Year Deadline Apply To The Public Entity's Duty To "Adopt" A Reauthorization Resolution?**

The City argues that section 1245.245 does not impose any time limit on a public entity's adoption of a reauthorization resolution because the statute refers to "10 years" only when defining how long the property has not been put to its designated "public use" (in one clause of subdivision (b)) and *not* when it refers to the adoption of a reauthorization resolution (elsewhere in subdivision (b) or in subdivision (f)). The Legislature's failure to re-state the "10 year" limit when specifically discussing reauthorization resolutions, the City reasons, means that there is no time limit for those resolutions. We reject this argument.

Whether section 1245.245 requires the public entity to adopt its reauthorization resolution within 10 years of adopting its original resolution presents a question of statutory interpretation. When interpreting a statute, "[o]ur fundamental task . . . is to ascertain the Legislature's intent so as to effectuate the law's purpose." (*People v. Mendoza* (2000) 23 Cal.4th 896, 907.) As noted above, the undisputed purpose of subdivisions (b) and (f) of section 1245.245 is to foreclose public entities from indefinitely retaining property that was acquired through eminent domain but not put to public use, and the statute achieves this purpose by giving public entities three options: Put the property to public use within 10 years, adopt a new resolution reauthorizing that use, or sell the property (with a right of first refusal to the original owner). The only way to ensure that section 1245.245 achieves its purpose is to require that the new, reauthorization resolution be adopted within 10 years of the original resolution. The contrary construction urged by the

10

City—namely, that section 1245.245 imposes *no* deadline for adopting a reauthorization resolution—would allow public entities to put off that task forever and, in so doing, allow them to indefinitely retain condemned property without ever putting it to public use, which is *precisely* the evil section 1245.245 was intended to prevent.  As between the construction of section 1245.245 that furthers its purpose and the one that undermines it, we must go with the former.  (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1397; *Diaz v. Grill Concepts Services, Inc.* (2018) 23 Cal.App.5th 859, 875.)

The City resists this conclusion with what boils down to three arguments.  First, the City asserts its interpretation of section 1245.245 is supported by one of the canons of statutory construction—namely, that a legislature's use of "different language in statutory provisions addressing the same subject" means that provisions with different language should have different meanings.  (E.g., *People v. Trevino* (2001) 26 Cal.4th 237, 242.)  Citing this canon, the City continues that our Legislature did not intend to impose a 10-year deadline for a reauthorization resolution because it included a 10-year deadline in the clause of subdivision (b) addressing the failure to use the property for public use *but not* the clause in subdivision (b) addressing reauthorization resolutions or in subdivision (f), and further distinguished the two acts of failing to use the property versus adopting a reauthorization resolution—by using different verb tenses (past versus present) when describing them.  These assertions ignore that the canons of statutory construction are merely "'guides to help courts determine likely legislative intent.'"  (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017.)  Where, as here, our Legislature's purpose is abundantly clear,

11

canons of construction must yield to that purpose; they certainly cannot be used to *undermine* it. (*Roberts v. United Healthcare Services, Inc.* (2016) 2 Cal.App.5th 132, 146 ["Where . . . [a] canon leads to a result at odds with the otherwise clearly expressed legislative intent, the canon necessarily yields to that intent."].)

Second, the City cites to a passage from the legislative history of section 1245.245 indicating that the statute "would not impose arbitrary or inflexible restrictions on public entities' future land use decisions," and on this basis contends that section 1245.245 should not be construed to require a public entity to adopt a reauthorization resolution within 10 years because such a fixed deadline would be arbitrary and inflexible. We reject this contention for several reasons. To begin, the passage the City cites does not refer to deadlines at all and appears instead to be referring to section 1245.245's flexibility in giving public entities the option to choose whether to sell an acquired property or instead to adopt a reauthorization resolution. More to the point, this passage cannot justify a construction of section 1245.245— that is, the absence of *any* deadline—that is wholly inconsistent with our Legislature's reason for enacting the statute in the first place. Indeed, even the City acknowledges the need for *some* deadline for a reauthorization resolution when it notes that, even under its view, the 10-year mark would still be the "default" deadline and the "natural trigger" for "taking up [a] reauthorization resolution," and even goes so far as to offer up its prediction that the 10-year deadline would be met "in the normal course of events." Thus, the City seems to suggest that section 1245.245 should be read to impose a 10-year limit that is more of a *guide*-line than a *dead*-line. But there is absolutely *no* basis for

12

fashioning such a "meet it if you feel like it" deadline—either from the text or legislative history of section 1245.245.[6]

Lastly, the City argues that there is no reason to construe section 1245.245 to impose a 10-year deadline for adopting a reauthorization resolution because public entities could easily subvert such a deadline by simply enacting a new resolution of necessity. The City is wrong. To the extent the City is arguing that a public entity can blow the 10-year deadline for a reauthorization resolution but sidestep the consequences of doing so under section 1245.245 by holding onto the property and thereafter enacting a brand new, "original" resolution of necessity subject to no time restrictions whatsoever, we reject this argument. Because we read statutes ""with reference to the entire scheme of law of which [they are a part] so that the whole may be harmonized and retain effectiveness""" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 (*Horwich*)), we necessarily read the eminent domain statutes to prevent this type of gamesmanship because it would authorize an end-run around section 1245.245's 10-year deadline that would render its provisions a complete nullity. (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 ["An interpretation that renders statutory language a nullity is obviously to be avoided."].) To the extent the City is arguing that a public entity that blows the 10-year deadline and sells the property has the power to thereafter initiate an entirely new eminent domain proceeding with a new

---

[6] Because section 1245.245's 10-year fixed deadline also does not depend on a public entity's reasons for the delay in development, the trial court properly sustained relevance objections to the City's evidence as to *why* it did not develop the property between 2007 and 2017.

13

resolution of necessity to reacquire the property, this is true but ignores that this alternative process entails substantial transaction costs such as having to conduct a new valuation of property and to engage in negotiations with the owner. (See § 1245.230, subd. (c)(4); Gov. Code, § 7267.2; see *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 504.) These costs negate the very premise of the City's argument that this process would be an easy and viable substitute for a reauthorization resolution.

## II. How Does Section 1245.245 Define When Initial And Reauthorization Resolutions Are "Adopted"?

Because section 1245.245, subdivision (b) requires a public entity seeking to retain a property previously acquired by eminent domain but not put to public use to "*adopt*[]" a resolution reauthorizing that use "within 10 years of the *adoption* of [its original] resolution of necessity" (§ 1245.245, subd. (b), italics added), the next question is: How does section 1245.245 define when a resolution is "adopted"? Section 1245.245 provides no express definition. Where, as here, a public entity's adoption of a resolution of necessity requires some initial action by the entity's legislative body followed either by executive concurrence or a legislative override, "adoption" could have one of three possible meanings: (1) when the resolution is *initially adopted* by the entity's legislative body (but prior to completion of the additional steps necessary to finally adopt the resolution), (2) when the resolution is *finally adopted* through initial adoption followed by executive concurrence or legislative override, or (3) when the resolution *becomes effective*, which is typically after final adoption followed by publication of the resolution. Choosing among these three adoptions turns on two questions: (1) Does section 1245.245 look to a resolution's "adoption" date or its "effective"

14

date?, and (2) If section 1245.245 looks to the "adoption" date, does it look to the date a resolution is initially adopted or finally adopted?

### A.    *Adoption date versus effective date*

As between the date that a public entity adopts a resolution and the date that resolution becomes effective, section 1245.245 looks to the date of adoption.  The date a resolution or any other law is adopted and the date it becomes effective are separate dates (*Ross v. Board of Retirement of Alameda County Employees' Retirement Assn.* (1949) 92 Cal.App.2d 188, 193 ["the date of 'adoption' or passage of an ordinance or statute is not the date the enactment becomes . . . effective"]; *Gleason v. Santa Monica* (1962) 207 Cal.App.2d 458, 461 [same]), and section 1245.245 specifies that the relevant date is the date of adoption.  We are obligated to give effect to the statute's plain text and may not swap one term for the other.  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [courts "must look first to the words of the statute[]" itself]; *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [courts have "'no power to rewrite [a] statute'"].)  Using the date a resolution is adopted (rather than the date it becomes effective) is also more consistent with the approach taken throughout the Eminent Domain Law. (*Horwich*, *supra*, 21 Cal.4th at p. 276 [statute should be read "'"with reference to the entire scheme of law of which it is a part"'"].)  That is because the timing for a public entity's eminent domain proceeding and for a property owner's inverse condemnation action are also keyed to the date the public entity "adopt[s]" the resolution of necessity, not the date that resolution becomes effective.  (§§ 1245.220 [date for eminent domain

15

proceeding], 1245.260 [date for inverse condemnation action].) In all of these situations, the focus is on what the public entity has *done or not done*; the effective date, by contrast, is typically keyed to the subsequent, "ministerial act[]" of publication "for the purpose of authenticating the [public entity's] action . . ., and giving notice of" that action (*Pacific Palisades Asso. v. Huntington Beach* (1925) 196 Cal. 211, 221).

The City makes two arguments in favor of its view that section 1245.245 looks to the effective date. First, the City cherry picks passages from a handful of cases and statutes, each of which can be read to equate a law's adoption with its effective date. (E.g., *Modesto City Schools v. Education Audits Appeal Panel* (2004) 123 Cal.App.4th 1365, 1375 (*Modesto*) ["'adopt' means . . . 'to accept formally and *put into effect*'"], italics added; *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1072 (*Watsonville*) [same]; Health & Saf. Code, § 18906 ["'adopt' means, with respect to the procedure for promulgation of a building standard, the final act of a state agency"]; Civ. Code, § 1834.9, subd. (f)(9) [deferring to alternative methods of animal testing if "adopted by" federal agencies and defining "'[a]dopted by a federal agency'" as "a final action taken by an agency, published in the Federal Register, for public notice"].) This authority is unhelpful. Not only do these cases and statutes arise in wholly unrelated contexts, but they also do not involve a choice between the date of a law's adoption and the law's effective date (*Modesto*, at pp. 1374-1375 [school district did not "adopt" valid independent study agreements because the agreements it enacted did not contain the content required by state law]; *Watsonville*, at pp. 1070-1072 [city did not "adopt" valid airport land use commission because its city plan did not

16

contain the content required by state law]), and the two cases the City cites merely parrot definitions plucked from a dictionary and that are thus to be approached with "'great caution'" (*Stennett v. Miller* (2019) 34 Cal.App.5th 284, 293, fn. 4; *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649). More to the point, the City's proffered authority in no sense overrides the considerations we have found to be determinative with respect to section 1245.245—namely, our Legislature's decision to use a resolution's date of "adoption" (rather than the "effective date") as a common point of reference throughout the Eminent Domain Law as well as its decision to look to "adoption" date rather than "effective date" (as opposed to equating the two concepts). (Cf. *Modesto,* at p. 1377 [treating legislative intent of specific statute at issue as dispositive].)

Second, the City argues that there are downsides to defining section 1245.245's 10-year clock by reference to the date a resolution is adopted rather than its effective date because doing so will likely leave a public entity with less than a full 10 years to develop the condemned property. Once a resolution is finally adopted, a public entity may have to wait for it to become effective (either under its charter or under the Elections Code provisions applicable to non-charter cities that mandate a delay of 30 days to allow for possible voter referenda (Elec. Code, §§ 9235, 9237; see *id.* § 9247 [these provisions inapplicable to charter cities and counties])). And a public entity will need to start preparing a reauthorization resolution prior to the 10-year deadline if it hopes to *finally adopt* that resolution before that deadline. These are valid observations. But there are also downsides to defining section 1245.245's 10-year clock by reference to the effective date of a resolution. Chief among them

17

is the potential for a public entity to manipulate that date by advancing or delaying the date of publication (even within the discretion legally granted to the entity under its governing law). Indeed, the City in this very case calculated the effective date of the 2017 Ordinance twice to select an effective date that it believed would satisfy section 1245.245's deadline. Given that both options have what may be viewed as drawbacks, our Legislature's decision to use the adoption date of a resolution rather than its effective date was not an absurd choice; absent absurdity, we may not ignore section 1245.245's plain text. (*People v. Broussard* (1993) 5 Cal.4th 1067, 1071.) If anything, our Legislature's decision to go with the date of "adoption" dovetails perfectly with the maxim that favors construing statutes in a manner that *prevents* "mischief" rather than encouraging it. (*Freedland v. Greco* (1955) 45 Cal.2d 462, 468.)

### B.   *Initial adoption versus final adoption*

As between the date that a public entity initially adopts a resolution and the date it finally adopts it, section 1245.245 looks to the date of final adoption. There is no distinction between these dates when a public entity's process of enacting a resolution requires only the vote of the entity's legislative body (as it does for cities without charters) (Gov. Code, § 36936); as to such entities, the date of initial adoption is also the date of final adoption. But when a public entity's process of enacting a resolution requires the initial adoption by the entity's legislative body *plus* the concurrence of the entity's executive or, failing that, a second vote of the legislative body to override the executive's veto, the pertinent date under section 1245.245 is the date that all the necessary steps for enactment are completed—that is, the date of final adoption. That is because, as noted above, section

18

1245.245 and the eminent domain statutes focus on when a public entity *acts* (or fails to act).  A public entity with a multi-step enactment process has not acted until all of those steps are completed; the initial adoption of a resolution by such an entity's legislative body is most certainly a step in that process (and, indeed, often the biggest and most important step), but that step is ineffectual by itself and may turn out to be wholly ineffectual if the entity's executive vetoes the initially adopted resolution and the legislative body cannot or does not override that veto.  We divine no rational reason why our Legislature would peg the start and end of its 10-year clock to a date corresponding to an ineffectual, intermediary point in the more complex process of enactment used by many public entities, and accordingly conclude section 1245.245 looks to the date that a public entity finally adopts its resolutions.

Rutgard offers one argument in favor of its view that section 1245.245 looks to the date a resolution is initially adopted.  He argues that section 1245.245 focuses on when a public entity's "*governing body*" adopts a reauthorization resolution (§ 1245.245, subd. (a), italics added); that the Eminent Domain Law defines a public entity's governing body as "the *legislative body* of the local public entity" (§ 1245.210, subd. (a), italics added); and that the "adoption of a resolution" under section 1245.245 must therefore focus *solely* on when the legislative body initially adopted the resolution.  This text-based argument overlooks that section 1245.245, subdivision (b), expressly defers to whatever "greater vote" is "required by statute, *charter*, or ordinance." (§ 1245.245, subd. (b), italics added.)  Here, as discussed more fully below, the City's charter requires *more* than just a vote of the City Council before an

19

ordinance is adopted:  It requires a mayoral concurrence or, failing that, a three-fourths override vote of the City Council.

## III.   To What Law Does Section 1245.245 Look In Assessing Whether A Public Entity's Resolutions Are Finally Adopted?

Because section 1245.245 looks to the date of "final adoption," the next question becomes:  Does section 1245.245 supply its own, standardized, one-size-fits-all definition of "final adoption" or does it defer to however the law governing the public entity at issue defines "final adoption"?  We conclude that section 1245.245 incorporates the local law definition, and reach this conclusion for two reasons.

First, section 1245.245 does not purport to define "adoption" or, as we have construed that term, "final adoption," and we are loathe to fashion a uniform definition out of whole cloth where our Legislature has declined to do so.  (*People ex rel. Pierson v. Superior Court* (2017) 7 Cal.App.5th 402, 414 [declining to fill a gap when "the judiciary would be required to fill [a] void out of whole cloth"]; see also, *Freeman v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4th 660, 667 ["it is not for this court to fill the statutory void"].)

Second, section 1245.245 elsewhere looks to local "charter[s] or ordinance[s]" governing the process by which a public entity's governing body "adopts" resolutions (§§ 1240.040, 1245.245, subd. (b)).  There is good reason to apply this same approach of looking to local law to determine when a resolution is "finally adopted."  The Eminent Domain Law applies to "public entit[ies]" (§ 1245.220), and defines that term to apply broadly to the "state" itself as well as any "county, city, district, public authority, public agency, and any other political subdivision in the state" (§ 1235.190).  While some of these political subdivisions

20

are subject to the general law of the state, cities with charters (and, to a lesser extent, counties with charters) have "'home rule'" authority to opt out of the general law and follow their own law as to the "'municipal affairs'" governed by their charters. (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 660 (*First Street*); *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 556; Cal. Const., art. XI, §§ 3, 5.) These municipal affairs include the "structure and organiz[ation]" of a charter city's "government" (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1207), which necessarily entails the process for enacting ordinances, including resolutions of necessity. Because chartered public entities are constitutionally empowered to "combine executive, legislative and judicial functions in a manner different from the structure that the California Constitution prescribes for state government" (*Lockyer v. City & County of San Francisco* (2004) 33 Cal.4th 1055, 1093, fn. 23; *D'Amato v. Superior Court* (2008) 167 Cal.App.4th 861, 869), it makes sense to construe section 1245.245 in a way that acknowledges—rather than squelches—this freedom to experiment.

## IV.    When Is A Resolution Finally Adopted Under The Los Angeles City Charter?

Because we have concluded that section 1245.245's 10-year deadline looks to the date a public entity's initial and reauthorization resolutions are finally adopted and defers to the definition of final adoption supplied by the law governing the public entity at issue, the final question becomes: How does the City define when a resolution is finally adopted?

The City is a charter city that has invoked its constitutional "home rule" authority over municipal affairs. (L.A.

City Charter (Charter), vol. I, art. I, § 101 [so declaring]; *First Street*, *supra*, 65 Cal.App.4th at p. 661 [so noting].)

The City's charter "vests" the City Council with "[a]ll legislative power" to be "exercised by [enacting] ordinance[s]," but makes that power "subject to the power of veto by the Mayor." (Charter, vol. I, art. II, § 240.)  The Charter goes on to specify the resulting "[p]rocedure for [a]doption of [o]rdinances" in a section of the Charter so entitled.  (*Id.*, § 250.)  The first step is for the City Council to "pass[]" an ordinance.  (*Id.*, § 250, subd. (a).)  The next step is for the Mayor either (1) to "approv[e]" the ordinance, by signing it or by taking no action for 10 days after the ordinance is presented to him, or (2) to "veto" the ordinance.  (*Id.*, § 250, subd. (b).)  If the Mayor vetoes the ordinance, the final step is for the City Council to override that veto with a greater vote (two-thirds if a majority was required to pass the ordinance, and three-fourths if two-thirds or more was required).  (*Id.*, § 250, subd. (c).)  The Charter elsewhere explains that an ordinance that is "finally adopted" does not become "effective" until 31 days after it is "publi[shed]" or posted for 10 days unless the ordinance qualifies for immediate effectiveness.  (*Id.*, §§ 251-253; L.A. Admin. Code, § 2.13.)

Under the City's charter, an ordinance is "finally adopted" once it has passed the City Council *and* either (1) been approved by the Mayor or (2) if not approved, passed by a second, override vote of the City Council.  The Charter labels this entire process—not just the first step of City Council initially passing the ordinance—under the heading of "Procedure for Adoption of Ordinances" (Charter, vol. I, art. II, § 250), and this heading is entitled to "considerable weight."  (*People v. Hull* (1991) 1 Cal.4th 266, 272 [""section headings"" "are entitled to considerable

weight'" "'"in determining legislative intent"'" (citation omitted)].) What is more, an ordinance is finally adopted under the City's charter *before* it becomes effective. Section 251 of the Charter explicitly distinguishes between the "final[] adopt[ion]" of an ordinance and when it "take[s] effect." (Charter, vol. I, art. II, § 251.) Indeed, our Supreme Court recognized as much when interpreting a preceding version of the City's charter that used identical language. (*Solomon v. Alexander* (1911) 161 Cal. 23, 26 ["'finally adopted' . . . does not mean taking effect of the ordinance by publication."].) Nor is the distinction between an ordinance's adoption and its effective date unique to the City's charter: Even the general law applicable to non-charter cities (and that has no mayoral component) draws a similar distinction between adoption and effective date. (Compare Gov. Code, §§ 36936, 36933 [procedure for passage] with *id.* § 36937 [procedure for effective date]; see generally, *Fletcher v. Porter* (1962) 203 Cal.App.2d 313, 324 [general law provisions "apply to general law cities only and do not regulate charter cities"].)

Rutgard argues that no matter what the Charter might say about when an ordinance is "adopted" or "finally adopted," the City officials *in this case* treated the 2007 Ordinance as being "adopted" on May 29, 2007, and were otherwise sloppy in referring to when that ordinance was "passed," "approved" or "adopted." In support of this argument, Rutgard points to a May 2015 motion by one member of the City Council referring to the 2007 Ordinance as being "approved" on May 27, 2007 (a date that is, itself, off by two days); a subsequently prepared draft for the 2017 Ordinance refers to the 2007 Ordinance as being "approved" on that date as well. This is irrelevant. A single Council member does not purport to speak for the entire City (*Myers v. Philip*

23

*Morris Companies, Inc.* (2002) 28 Cal.4th 828, 845 ["single legislator" does not "reflect . . . the views . . of the Legislature as a whole"]), and even if he did, his misstatement or misapprehension regarding when an ordinance is "finally adopted" under the Charter does not somehow amend the Charter in this regard. Nor do his statements create any estoppel, as the City's error was to its own detriment and Rutgard has accordingly failed to allege or substantiate any detrimental reliance. (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 494; *Penn-Co v. Board of Supervisors* (1984) 158 Cal.App.3d 1072, 1081.) The same is true for the imprecise language regarding the 2007 Ordinance that is littered throughout the administrative record.

## V.     Application

Under the law as we have construed it and the undisputed facts, the 2017 Ordinance is not timely under section 1245.245. The 2007 Ordinance was finally adopted on June 8, 2007, which is the date that the Mayor approved the City Council-enacted initial resolution of necessity for the Property. The 2017 ordinance was finally adopted on June 27, 2017, which is the date that the Mayor approved the City Council-enacted reauthorization resolution. Because the reauthorization resolution was not "adopted" "within 10 years" of the initial resolution, it is untimely and the City is statutorily obligated—by section 1245.245, subdivisions (b) and (f)—to sell the Property and to give Rutgard a right of first refusal in purchasing it.

24

## DISPOSITION

The judgment is affirmed.  Rutgard is entitled to his costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>.**


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ